# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-60292-CIV-ZLOCH

AIM RECYCLING FLORIDA, LLC, a
foreign limited liability company; and LKQ
PICK YOUR PART SOUTHEAST, LLC, a
foreign limited liability company,

     Plaintiffs,

v.

METALS USA, INC., a Florida corporation;
UNIVERSAL SCRAP MANAGEMENT,
LLC, a Florida limited liability company;
OBED LENDIAN, an individual; and
SAMUEL ABREU, an individual,

     Defendants.
_____/

### <u>AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF</u>

Plaintiffs, AIM Recycling Florida, LLC ("AIM") and LKQ Pick Your Part Southeast, LLC ("LKQ") (collectively, "Plaintiffs"), sue Defendants, Metals USA, Inc. ("Metals USA"), Universal Scrap Management, LLC ("Universal"), Obed Lendian ("Lendian"), and Samuel Abreu ("Abreu") (collectively, "Defendants"), and allege:

### <u>PARTIES</u>

1.    LKQ is a Delaware limited liability company with one member—LKQ Southeast, Inc. ("LKQ Southeast")—that is a Delaware corporation with its principal place of business in Cook County, Illinois.

2.    AIM is a Delaware limited liability company authorized to transact business in Florida. AIM has two members: (i) LKQ and (ii) American Iron & Metal (U.S.A.) Inc.

American Iron & Metal (U.S.A.) Inc. is a Delaware corporation with its principal place of business in Montreal, Canada.

3.      Metals USA is a Florida corporation with its principal place of business in Miami-Dade County, Florida.

4.      Universal is a Florida limited liability company with its principal place of business in Broward County, Florida

5.      Lendian is a resident of Broward County, Florida.  Lendian also owns, operates, manages, or directs both Metals USA and Universal.

6.      Abreu is a resident of Miami-Dade County, Florida.  Abreu is also a former employee of Plaintiffs.

## JURISDICTION AND VENUE

7.      This action arises under RICO, 18 U.S.C. § 1961, *et seq.* and the statutory and common law of Florida.

8.      Subject matter jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1332, and 1367 and 18 U.S.C. § 1961, *et seq.*  There is complete diversity because Plaintiffs' members are citizens of foreign states, the Defendants, Metals USA, Universal, Lendian, and Abreu, are citizens of Florida, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.  There is also federal question jurisdiction because Plaintiffs' Civil RICO claims allege violations of a federal law.  There is supplemental jurisdiction over Plaintiffs' state law claims because they arise out of the same case or controversy as the federal law claims, and all claims in this action arise out of a common nucleus of operative facts.

9.      Personal jurisdiction exists over Defendants because they are citizens of Florida. Further, personal jurisdiction exists because Defendants, through their racketeering activities, committed criminal and tortious acts in the Southern District of Florida, directed these acts toward the Southern District of Florida, and utilized instrumentalities located in the Southern District of Florida to carry out these acts alleged in this Amended Complaint, all of which have damaged Plaintiffs in the Southern District of Florida.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1), and 18 U.S.C. § 1965(a), because Defendants are residents of this district, transact their affairs in this district, and the events giving rise to the claims in this Amended Complaint occurred in this district.

11.     All conditions precedent to the filing and maintenance of this action were performed, occurred, or waived prior to the commencement of this action.

## COMMON ALLEGATIONS

12.     LKQ Southeast acquired an industrial scrap metals facility (the "Facility") located at 4500 Oakes Road in Davie, Broward County, Florida in December 2012.

13.     In September 2014, LKQ Southeast entered into an agreement with American Iron & Metal (U.S.A.) Inc. to manage the Facility.

14.     In December 2015, LKQ Southeast, Inc. transferred all assets, liabilities, and accounts receivable to LKQ.

15.     Thereafter, American Iron & Metal (U.S.A.) Inc. and LKQ entered into a joint venture in March 2017, forming AIM to manage and operate the Facility.

16.     The Facility's primary operation is the shredding of automobiles and other materials for scrap metals that are then sold to third parties throughout the United States and internationally to countries such as Canada, China, and India.

**The Intake Process**

17.     When a truck loaded with automobiles or other materials first arrives at the Facility, it is weighed at the "scale house" on the inbound scales, and its gross weight is established.

18.     The truck is then directed to the front of the shredding machine where it unloads the automobiles or other materials.

19.     After unloading the automobiles and other materials, the truck is weighed a second time at the scale house, this time on the outbound scales, before it exits the yard, to establish the "tare" weight.

20.     The weight difference between the inbound and outbound scales is then used to calculate the price to be paid to the supplier of the automobiles and other materials loaded on any particular truck.

**The Shredding Process**

21.     The collected automobiles and other materials are next placed in the shredder where they are processed and segregated into three core groups: (i) ferrous metals (i.e., scrap metal or frag), approximately 70%; (ii) non-ferrous metals (aluminum, copper, other), approximately 5%; and (iii) fluff (i.e., stuffing for car seats, plastic, other), approximately 25%.

22.    After segregation, the finished goods of scrap metal, non-ferrous, and fluff end-up at the back-end of the Facility in separate piles.

23.    The ferrous metals and scrap metals are then sold by Plaintiffs to various refineries throughout the United States and in Canada, China, and India, and Plaintiffs contract with a third party to dispose of the fluff.

24.    A diagram of the Facility and lot is copied below. The left side of the diagram depicts the back lot area where the metals are stored following separation.



## The Racketeering Enterprise Is Uncovered

25.    In around late 2017, Plaintiffs noticed discrepancies in the Facility's books and records.

26.    To resolve the observed discrepancy, Plaintiffs instituted an internal investigation into the Facility's operations.   During the internal investigation, several employees working at the Facility confessed to taking part in a fraudulent scheme to defraud and steal from Plaintiffs.

27.    Specifically, the employees confessed to their knowing participation in a multi-year, multi-level theft scheme that was organized, managed, and operated in part by Lendian.

## The Racketeering Enterprise

28.     Beginning around 2013 and continuing through January 2018, Lendian served as the ring-leader of an organized criminal scheme, the primary purpose of which was to steal the Plaintiffs' valuable scrap metal, deliver the stolen scrap to Metals USA and/or Universal, and then Metals USA or Universal would sell the stolen scrap metal to buyers in Florida, throughout the United States, and to international buyers.

29.     To accomplish this enterprise, Lendian recruited one of Plaintiffs' employees to serve as the "middle manager" of the scheme and internally operate part of the enterprise at Plaintiffs' Facility.  The "middle manager" would take orders and direction from Lendian, and the "middle manager" would then carry out Lendian's orders at the Plaintiffs' Facility. Lendian's orders required the "middle manager" to orchestrate the activity of other co-conspirators, including the Plaintiffs' (now former) employees and truck drivers.

30.     From approximately 2013 to late 2015, Jose Rodriguez ("Rodriguez") served as the "middle manager" working at Plaintiffs' Facility.  In this capacity, Rodriguez would take orders from Lendian (or Lendian's representatives and agents).  Lendian would instruct Rodriguez when to steal Plaintiffs' valuable scrap metal, how much valuable scrap to steal, and where to deliver the valuable scrap.

31.     Rodriguez, after receiving instructions from Lendian, would then direct the activities of certain Plaintiffs' employees and truck drivers, who had been recruited by Lendian and Rodriguez to assist in the enterprise.

32.     Specifically, Rodriguez would work in concert with Plaintiffs' former employees, Michael Guzman ("Guzman") and "Mondi".  Guzman would open the back gate

of Plaintiffs' Facility, and would permit trucks to drive onto the Facility.  The Plaintiffs' former employees would then use Plaintiffs' loaders to load the valuable scrap metal into trucks, and then the drivers would steal the Plaintiffs' valuable scrap metal and deliver it to Metals USA.

33.     Lendian would pay Rodriguez directly, or Lendian would have Rodriguez paid through an agent, Ruben Encarnacion ("Encarnacion").

34.     Rodriguez would keep a portion of the money he received from Lendian, and he would then distribute the rest to the truck drivers and to the Plaintiffs' employees.

35.     In addition to paying Guzman and "Mondi" for their active participation in the enterprise, Rodriguez also paid other of Plaintiffs' employees for their silence—one such employee was Abreu.

36.     From approximately June 2014 until late 2015, Abreu was paid by Rodriguez for his silence.

37.     Around late 2015, Lendian demoted Rodriguez and installed Abreu as the new "middle manager" of the scheme.

38.     From approximately late 2015 to January 2018, Abreu then served as the "middle manager" working at Plaintiffs' Facility.  In this capacity, Abreu would take orders from Lendian (or Lendian's representatives and agents).  Lendian would instruct Abreu when to steal Plaintiffs' valuable scrap metal, how much valuable scrap to steal, and where to deliver the valuable scrap—either Metals USA or Universal.

39.     Abreu, after receiving instructions from Lendian, would then direct the activities of certain of Plaintiffs' employees and truck drivers, who had been recruited by Lendian and Abreu to assist in the enterprise.

40.     Specifically, Abreu would work in concert with Plaintiffs' now former employees, Guzman, Rodriguez, Chris Scocchera ("Scocchera"), and Walter Castillo ("Castillo").  Guzman would open the back gate of Plaintiffs' Facility, and would permit trucks to drive onto the Facility.  The Plaintiffs' former employees would then use Plaintiffs' loaders to load the valuable scrap metal into trucks, and then the drivers would steal the Plaintiffs' valuable scrap and deliver it to Metals USA or Universal.

41.     Lendian (or a representative on his behalf) would pay Abreu directly.

42.     Abreu would keep a portion of the money he received from Lendian, and Abreu would then distribute the rest to the truck drivers and to the Plaintiffs' employees.

43.     In addition to paying Guzman, Rodriguez, Scocchera, and Castillo for their active participation in the theft, Abreu also paid other of Plaintiffs' employees for their silence and for their efforts to conceal the scheme, including: Ajani Francis ("Francis"), Nick Fredricks ("Fredricks"), Shawn Higginbotham, and Pedro Torres ("Torres").

44.     Around 2016, Fredricks took further efforts to help conceal the scheme by falsifying the weights on the Plaintiffs' books and recording lower weights than the actual amounts reported on the shredder belt scales.  To accomplish this, Francis would "radio" the correct weights reported on the belt scale to Fredricks, who would then record a lower weight in the Plaintiffs' record books.

45.     By misreporting the belt scale weights, the Defendants and their co-conspirators were able to reduce the amount of expected material at the Plaintiffs' Facility and thereby conceal some portions of the stolen scrap from the Plaintiffs' record books.

46.     Around August 2017, after the scheme had already been operating for over three-and-a-half years, Torres and Abreu devised a new method for concealing a fraction of the material that the Defendants and their co-conspirators were stealing from the Plaintiffs.

47.     By manipulating the Facility's scales, Torres was able to hide up to ten (10) tons of purchased materials a week.  Although the Defendants and their co-conspirators stole many times more than this amount each week, the scale manipulation permitted the conspirators to conceal some portion of their thievery.

48.     The altered and falsified weights were recorded on Plaintiffs' electronic record keeping system, and the falsified records were sent, via e-mail (wire), to a related accounting facility in Nashville, Tennessee.

49.     Throughout the entirety of the scheme, the Defendants used interstate wires to direct the metals theft scheme from Florida to elsewhere in the United States and to foreign countries.

50.     Throughout the entirety of the scheme, the Defendants and their co-conspirators conducted hundreds of individual thefts.

51.     The Defendants and their co-conspirators operated the scheme at the direction of Lendian and the "middle managers," and not as a result of individually participating in each individual theft—and the overall enterprise—for their own gain.

52.     At Lendian's direction, Metals USA and Universal knowingly purchased the stolen scrap metal for a fraction of its market value and then sold the stolen scrap metal to some of the same vendors who purchased from Plaintiffs directly, including various refineries throughout the United States and in Canada, China, and India.

53.     Metals USA and Universal profited by selling the stolen scrap metal for many times more than the amount they paid to Rodriguez and Abreu to "middle manage" the enterprise.

54.     Lendian, as an owner and officer of Metals USA and Universal, kept for himself many of the ill-gotten profits Metals USA and Universal obtained from the illegal scheme.

55.     The "middle managers," including Abreu, profited by keeping the largest portion of the funds paid to them by Lendian, Metals USA, and Universal for the stolen scrap metal.

56.     The other co-conspirators profited by being paid for their efforts to advance the scheme.

### COUNT I
### CIVIL RICO: VIOLATIONS OF 18 U.S.C. § 1962(c)
### (Against all Defendants)

57.      Plaintiffs reallege and incorporate by reference Paragraphs 1 through 56 of this Amended Complaint as if fully set forth in this Paragraph.

58.     Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

59.     Defendants and others were a group of persons associated together for the common purpose of carrying out the fraudulent scheme described in this Amended Complaint. Over the years, Defendants adapted their scheme to changing circumstances, recruiting new conspirators to assist with their wrongful activities and altering the scope and nature of their activities as necessary to advance the objectives of the fraudulent scheme.

60.     Lendian was one of the primary architects of the fraudulent enterprise and was associated with the fraudulent scheme within the meaning of 18 U.S.C. § 1962(c).  Operating out of Florida, he was responsible for directing and managing the theft, concealment, and wrongful retention of the proceeds of the fraudulent scheme.  At all relevant times, he knew that the property and proceeds from the fraudulent scheme were obtained through wrongful criminal conduct. Lendian directed Abreu and others to facilitate the transportation of stolen property through interstate commerce, and to use wire communications to facilitate this fraud.

61.     Metals USA is associated with the fraudulent scheme within the meaning of 18 U.S.C. § 1962(c). Operating out of Florida, Metals USA participated in the enterprise by purchasing the goods stolen (from the Facility) from other co-conspirators and benefited from the enterprise by obtaining the goods at a price significantly below the market price for those goods.

62.     Universal is associated with the fraudulent scheme within the meaning of 18 U.S.C. § 1962(c). Operating out of Florida, Universal participated in the enterprise by purchasing the goods stolen (from the Facility) from other co-conspirators and benefited from the enterprise by obtaining the goods at a price significantly below the market price for those goods.

63.     Abreu was one of the architects of the fraudulent enterprise and was associated with the fraudulent scheme within the meaning of 18 U.S.C. § 1962(c).  Operating out of Florida, he was responsible for managing the theft, concealment, and wrongful retention of the proceeds of the fraudulent scheme.  At all relevant times, he knew that the property and proceeds from the fraudulent scheme were obtained through wrongful criminal conduct.

11

Abreu directed Plaintiffs' employees and others to facilitate the transportation of stolen property through interstate commerce, and to use wire communications to facilitate this fraud.

64.     Defendants and others constituted an association-in-fact "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). The Defendants formed an ongoing organization, which functioned as a continuing unit, and the organization was separate from the pattern of racketeering activity in which it engaged.

65.     During the relevant period, the fraudulent enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

66.     Defendants participated, directly and indirectly, in the conduct, management, or operation of the fraudulent enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c):

> a.  Defendants and others transported stolen goods valued at more than $5,000 through interstate commerce, knowing the goods were stolen, converted, or taken by fraud, in violation of 18 U.S.C. § 2314.
>
> b.  Defendants and others used wire communications in connection with their scheme to defraud Plaintiffs, in violation of 18 U.S.C. § 1343.

67.     Plaintiffs have been injured in their business and property by reason of Defendants' conduct described above and have been forced to incur and will continue to incur substantial legal fees and related costs in their attempts to address Defendants' misconduct and stem the tide of economic damages such misconduct has caused.

68.     The scheme has occurred over a series of hundreds of predicate acts and over a number of years sufficient to rise to the level of a RICO enterprise.

69.    The Defendants' scheme is the legal and proximate cause of the damages Plaintiffs seek to recover by means of this action.

70.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages, plus costs and attorneys' fees from Defendants.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants for all actual and consequential damages arising from Defendants' conduct, including treble damages, an award of costs and all reasonable attorneys' fees pursuant, and any other further relief the Court deems just and proper.

## COUNT II
## CIVIL RICO CONSPIRACY, 18 U.S.C. § 1962(d)
### (Against all Defendants)

71.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 56 and 58 through 70 of this Amended Complaint as if fully set forth in this Paragraph.

72.    Defendants violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

73.    At this time, the known co-conspirators include all the individuals personally named in this Amended Complaint, Metals USA, Universal, and others to be discovered through discovery.

74.    Over the course of the many years of the scheme, Lendian directed hundreds of orders to the "middle managers," including Abreu, to accomplish the theft scheme.  During each of the hundreds of individual thefts, the "middle managers" agreed to follow Lendian's orders.

75.     The "middle managers," including Abreu, directed the other co-conspirators to accomplish the theft scheme.   During each of the hundreds of individual thefts, the co-conspirators agreed to follow the "middle managers" orders.

76.     Lendian directed Metals USA and Universal to receive and pay for the knowingly stolen scrap metal.  During each of the hundreds of individual thefts, Metals USA and Universal agreed to pay for and take possession of the knowingly stolen scrap.

77.     The above-described acts of the Defendants were all done in furtherance of the RICO conspiracy.

78.     Defendants agreed to accomplish an unlawful plan to engage in a pattern of racketeering activity.

79.     Defendants agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two of the acts of racketeering.

80.     As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Plaintiffs were injured in their business and property as set forth above.

81.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants for all actual and consequential damages arising from Defendants' conduct, including treble damages, an award of costs and all reasonable attorneys' fees, a preliminary and permanent injunction, and any other further relief the Court deems just and proper.

## COUNT III
## <u>FLORIDA RICO AND CIVIL REMEDIES FOR CRIMINAL ACTIVITIES</u>
### (Against All Defendants)

82.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 56 of this Amended Complaint as if fully set forth in this Paragraph.

83.     Defendants and others were a group of persons associated together for the common purpose of carrying out the fraudulent scheme described in this Amended Complaint. Over the years, Defendants adapted their scheme to changing circumstances, recruiting new conspirators to assist with their wrongful activities and altering the scope and nature of their activities as necessary to advance the objectives of the fraudulent scheme.

84.     Lendian was one of the primary architects of the fraudulent enterprise and was associated with the fraudulent scheme within the meaning of Section 772.103(3), Florida Statutes.  Operating out of Florida, he was responsible for directing and managing the theft, concealment, and wrongful retention of the proceeds of the fraudulent scheme.  At all relevant times, he knew that the property and proceeds from the fraudulent scheme were obtained through wrongful criminal conduct. Lendian directed Abreu and others to facilitate the transportation of stolen property through interstate commerce, and to use wire communications to facilitate this fraud.

85.     Metals USA is associated with the fraudulent scheme within the meaning of Section 772.103, Florida Statutes. Operating out of Florida, Metals USA participated in the enterprise by purchasing the goods stolen (from the Facility) from other co-conspirators and benefited from the enterprise by obtaining the goods at a price significantly below the market price for those goods.

86.     Universal is associated with the fraudulent scheme within the meaning of Section 772.103, Florida Statutes. Operating out of Florida, Universal participated in the enterprise by purchasing the goods stolen (from the Facility) from other co-conspirators and benefited from the enterprise by obtaining the goods at a price significantly below the market price for those goods.

87.     Abreu too was one of the architects of the fraudulent enterprise and was associated with the fraudulent scheme within the meaning of Section 772.103(3), Florida Statutes.  Operating out of Florida, he was responsible for managing the theft, concealment, and wrongful retention of the proceeds of the fraudulent scheme.  At all relevant times, he knew that the property and proceeds from the fraudulent scheme were obtained through wrongful criminal conduct.  Abreu directed Plaintiffs' employees and others to facilitate the transportation of stolen property through interstate commerce, and to use wire communications to facilitate this fraud.

88.     Defendants and others constituted an association-in-fact "enterprise" within the meaning of sections 772.102(3), 772.103(3), 895.02(5), and 895.03(3), Florida Statutes.  The Defendants formed an ongoing organization, which functioned as a continuing unit, and the organization was separate from the pattern of racketeering activity in which it engaged.

89.     Defendants participated, directly and indirectly, in the conduct, management, or operation of the fraudulent enterprise's affairs through a "pattern of criminal activity" within the meaning of sections 772.103(3) and 772.102(4), Florida Statutes, including the incidents of criminal activity described above.

90.     Defendants participated, directly and indirectly, in the conduct, management, or operation of the fraudulent enterprise's affairs through a "pattern of racketeering activity" within the meaning of sections 895.03(3) and 895.02(4), Florida Statutes, including the incidents of criminal activity described above.

91.     Defendants committed a substantial number of related incidents of criminal activity and racketeering conduct over an extended period of time, including the predicate acts discussed above. Each predicate act constitutes "criminal activity" within the meaning of section 772.102(1), Florida Statutes, and "racketeering activity" within the meaning of section 895.02(1), Florida Statutes.  Defendants' commission of predicate acts is part of a general course of business and is likely to continue unless they are prevented from committing such acts.

92.     Plaintiffs have been injured in their business and property by reason of Defendants' conduct described above and have been forced to incur and will continue to incur substantial legal fees and related costs in their attempts to address Defendants' misconduct and stem the tide of economic damages such misconduct has caused.

93.     The scheme has occurred over a series of predicate acts and over a number of years sufficient to rise to the level or a RICO enterprise.

94.     The Defendants' scheme is the legal and proximate cause of the damages Plaintiffs seek to recover by means of this action.

95.     Pursuant to section 772.104(1), Florida Statutes, Plaintiffs are entitled to recover treble damages, plus costs and attorneys' fees from Defendants.

96.    Pursuant to sections 895.05(1), 895.05(6), Florida Statutes, Plaintiffs are entitled to an injunction preventing Defendants from committing further violations of section 895.03, Florida Statutes.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants for all actual and consequential damages arising from the Defendants' conduct, including treble damages, an award of costs and all reasonable attorneys' fees, a preliminary and permanent injunction, and any other further relief the Court deems just and proper.

### COUNT IV
### FLORIDA CIVIL RICO AND REMEDIES FOR
### CRIMINAL ACTIVITIES - CONSPIRACY
### (Against All Defendants)

97.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 56 and 83 through 96 of this Amended Complaint as if fully set forth in this Paragraph.

98.    Defendants violated sections 772.103(4) and 895.04(4), Florida Statutes, by conspiring to violate sections 772.103(3) and 895.03(3), respectively.

99.    At this time, the known co-conspirators include all the individuals personally named in this Amended Complaint, Metals USA, Universal, and others to be discovered through discovery.

100.    Over the course of the many years of the scheme, Lendian directed hundreds of orders to the "middle managers," including Abreu, to accomplish the scrap theft scheme. During each of the hundreds of individual thefts, the "middle managers" agreed to follow Lendian's orders.

101.    The "middle managers," including Abreu, directed the other co-conspirators to accomplish the theft scheme.  During each of the hundreds of individual thefts, the co-conspirators agreed to follow the "middle managers" orders.

102.    Lendian directed Metals USA and Universal to receive and pay for the knowingly stolen scrap metal.  During each of the hundreds of individual thefts, Metals USA and Universal agreed to pay for and take possession of the knowingly stolen scrap metal.

103.    The above-described acts of the Defendants were all done in furtherance of the RICO conspiracy.

104.    Defendants agreed to accomplish an unlawful plan to engage in a pattern of criminal and racketeering activity.

105.    Defendants agreed to the overall objective of the conspiracy, or they agreed to commit personally at least two acts of criminal and racketeering activity.

106.    As a direct and proximate result of the predicate acts taken in furtherance of the conspiracy, Plaintiffs have been injured in their business or property.

107.    Despite their diligence and efforts, Plaintiffs' discovery of these ongoing injuries was delayed by Defendants' fraudulent concealment activity.

108.    Pursuant to section 772.104, Florida Statutes, Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from Defendants.

WHEREFORE, Plaintiffs demand judgment in their favor and against the Defendants for all actual and consequential damages arising from the Defendants' conduct, including treble damages, an award of costs and all reasonable attorneys' fees, a preliminary and permanent injunction, and any other further relief the Court deems just and proper.

## COUNT V
## <u>UNJUST ENRICHMENT</u>
### (Against Lendian, Metals USA, and Universal)

109.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 56 of this Amended Complaint as if fully set forth in this Paragraph.

110.    Through the fraudulent scheme, Lendian, Metals USA, and Universal (collectively the "Lendian Defendants") have been unjustly enriched at the expense of Plaintiffs.

111.    Plaintiffs conferred a benefit on the Lendian Defendants, when the Lendian Defendants acquired the Plaintiffs' stolen scrap metal at well below market rates.

112.    The Lendian Defendants knew of and appreciated this benefit by enjoying the profits and the monies acquired from selling the Plaintiffs' stolen scrap metal at, or near, market rates.

113.    Irrespective of issues of fault, the Lendian Defendants' acceptance and retention of the Plaintiffs' property and the profits from the stolen property under the circumstances is inequitable, because Plaintiffs paid market rates and incurred operating costs in the production of the property stolen, and the Lendian Defendants did not provide anything of value to Plaintiffs in exchange for the stolen property.

114.    Allowing the Lendian Defendants to retain the Plaintiffs' property or profits would unjustly enrich the Lendian Defendants to the detriment of Plaintiffs.

115.    Accordingly, the Lendian Defendants should be required to return all of Plaintiffs' property and disgorge all monies, profits, and gains that the Lendian Defendants obtained or will obtain in the future at the expense of Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court exercise its equitable powers and enter a judgment against the Lendian Defendants for all damages in an amount to be proven at trial, including but not limited to, prejudgment interest and its reasonable attorneys' fees and costs incurred in this action, a preliminary and permanent injunction, an accounting of Defendants' assets, a disgorgement of unjust enrichments, and any other further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, AIM Recycling Florida, LLC and LKQ Pick Your Part Southeast, LLC, request a trial by jury in this matter.

Dated: April 10, 2018                    Respectfully submitted,

By:   */s/ Benton Curtis*
Oliver Benton Curtis, III, Esq.
Florida Bar No. 118156
Ryan K. Todd, Esq.
Florida Bar No. 91679
Sara M. Klco, Esq.
Florida Bar No. 60358
**BROAD AND CASSEL LLP**
One Financial Plaza, 27th Floor
Ft. Lauderdale, FL 33394
bcurtis@broadandcassel.com
rtodd@broadnandcassel.com
sklco@broadandcassel.com
Telephone: (305) 373-9400
Fax: (305) 373-9443