AIM RECYCLING OF FLORIDA, LLC
and LKQ PICK YOUR PART
SOUTHEAST, LLC,

      Plaintiffs,

v.

METALS USA, INC., UNIVERSAL
SCRAP MANAGEMENT, LLC, OBED
LENDIAN, and SAMUEL ABREU,

      Defendants.

_____/

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon Plaintiffs AIM Recycling of Florida, LLC ("AIM")

and LKQ Pick Your Part Southeast, LLC's ("LKQ") (collectively, "Plaintiffs") Renewed Motion

for Partial Summary Judgment as to Liability, ECF No. [263] ("Plaintiffs' Motion for Summary

Judgment"), and Defendants Metals USA, Inc. ("Metals USA") and Obed Lendian's ("Lendian")

(collectively, "Defendants") Motion for Summary Judgment, ECF No. [261] ("Defendants'

Motion for Summary Judgment"), (collectively, the "Motions"). The Court has reviewed the

Motions, all opposing and supporting submissions, the record in this case, the applicable law, and

is otherwise fully advised. For the reasons set forth below, Plaintiffs' Motion for Summary

Judgment is denied, and Defendants' Motion for Summary Judgment is denied.

## I.    BACKGROUND

On February 9, 2018, Plaintiffs initiated the instant RICO[1] action against Metals USA and Samuel Abreu ("Abreu"), alleging a multi-year conspiracy to steal valuable scrap metal from Plaintiffs' facility, ECF No. [1], and the case was originally assigned to the Honorable William J. Zloch, ECF No. [2]. On April 10, 2018, Plaintiffs amended their Complaint, naming Lendian and Universal Scrap Management, LLC ("Universal") as additional Defendants. ECF No. [24] ("Amended Complaint").[2] Plaintiffs' Amended Complaint asserts five counts: Count I (Civil RICO – Violations of 18 U.S.C. § 1962(c)); Count II (Civil RICO Conspiracy – Violations of 18 U.S.C. § 1962(d)); Count III (Florida Civil RICO and Remedies for Criminal Activities); Count IV (Florida Civil RICO and Remedies for Criminal Activities – Conspiracy); and Count V (Unjust Enrichment). *Id.*[3]

Believing that the Department of Justice ("DOJ") planned to indict them on criminal charges, on March 1, 2019, Defendants filed a Motion for Temporary Stay. ECF No. [122]. On April 4, 2019, Judge Zloch granted the Motion for Temporary Stay, pending the resolution of Defendants' parallel criminal case. ECF No. [146]. On June 27, 2019, the instant action was reassigned to the undersigned. ECF No. [147]. Moreover, on August 26, 2019, the DOJ provided Defendants with a declination letter, indicating that the criminal investigation was closed and that the DOJ would not be prosecuting. ECF No. [151] at 1-2. On August 28, 2019, after being advised that the DOJ was closing its criminal investigation into Defendants, this Court lifted the stay. ECF No. [154].

---

[1] Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*

[2] The Motions before the Court today pertain only to Defendants Metals USA and Lendian, and any reference in this Order to "Defendants" should be understood as referring only to Metals USA and Lendian. The two other Defendants in this case — i.e., Abreu and Universal — will be referred to as such.

[3] Counts I-IV of Plaintiffs' Amended Complaint are asserted against Metals USA, Lendian, Universal, and Abreu, whereas Count V is brought against Metals USA, Lendian, and Universal. ECF No. [24].

Before this action was stayed pending Defendants' criminal prosecution, on February 15, 2019, Plaintiffs filed a Motion for Partial Summary Judgment as to Liability, ECF No. [120], and corresponding Statement of Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment as to Liability, ECF No. [119], which was never resolved prior to the case being stayed.

On August 29, 2019, after this Court lifted the stay, Plaintiffs filed a Renewed Motion for Partial Summary Judgment, ECF No. [158], incorporating the Statement of Material Facts from their original Motion, ECF No. [119]. On September 23, 2019, Defendants filed a Motion for Summary Judgment, ECF No. [177], and accompanying Statement of Material Facts, ECF No. [178]. On October 28, 2019, Plaintiffs moved to supplement the summary judgment record with certified English translations of telephone recordings of allegedly incriminating conversations between Abreu and Lendian. ECF No. [238].[4] This Court granted Plaintiffs' motion to supplement the summary judgment record and ordered the parties to revise their summary judgment briefing to address this supplemental evidence. ECF No. [258].

On November 26, 2019, pursuant to this Court's Order, Plaintiffs filed their Renewed Motion for Partial Summary Judgment, ECF No. [263], along with their corresponding Supplemented Statement of Material Facts, ECF No. [264] ("Plaintiffs' SOF"). Plaintiffs' SOF sets forth many facts that are premised upon adverse inferences derived from Lendian's invocation of his Fifth Amendment rights during his deposition due to the forthcoming criminal prosecution. *Id.* at 8-11. On December 10, 2019, Defendants filed their Response in Opposition to Plaintiffs' Motion for Summary Judgment, ECF No. [267] ("Response to Plaintiffs' Motion for Summary Judgment"), along with their Amended Counterstatement of Disputed Material Facts, ECF No.

---

[4] During these telephone calls, Lendian and Abreu were conversing in Spanish. Plaintiffs have not submitted the recordings themselves as summary judgment evidence. Instead, Plaintiffs submitted transcripts of these recordings with English translations, ECF Nos. [264-8] & [264-9], in support of their current Motion for Summary Judgment.

[272] ("Defendants' CSOF"). Defendants' CSOF included as an attachment Lendian's sworn affidavit asserting additional facts, to which he previously could not testify, in order to rebut the adverse inferences derived from his prior Fifth Amendment invocation. ECF No. [272] at 20-30. On December 17, 2019, Plaintiffs submitted their Reply, ECF No. [275].

Likewise, on November 26, 2019, Defendants filed their Motion for Summary Judgment, ECF No. [261], and accompanying Statement of Material Facts, ECF No. [262] ("Defendants' SOF"). On December 10, 2019, Plaintiffs filed their Response to Defendants' Motion for Summary Judgment, ECF No. [270] ("Response to Defendants' Motion for Summary Judgment"), and their corresponding Counter Statement of Material Facts, ECF No. [271] ("Plaintiffs' CSOF"), to which Defendants filed a Reply, ECF No. [274].

## II.  MATERIAL FACTS

Based on the parties' statements and counterstatements of material facts, along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

Plaintiffs operate an industrial scrap metal facility with approximately forty employees. Dep. of Plaintiffs' Corp. Representative 36:5-7, ECF No. [272] at 42-216 ("Gerding Dep."). Plaintiffs' facility "takes [] end-of-life crush cars and runs them through a massive shredding operation which separates — which hammers up the cars and separates the metals from the car and the waste into ferrous material, nonferrous material, and waste." Hr'g on Mot. for Prelim. Inj. Tr. 10:18-21,[5] ECF No. [264-2] ("Hr'g Tr."). Plaintiffs' facility primarily produces ferrous shred, which they then sell to customers domestically and internationally. Hr'g Tr. 14:18-20.

---

[5] In this Order, any citations to the page numbers from the transcript of the Hearing on Plaintiffs' Motion for Preliminary Injunction are based on the Case Management/Electronic Case Files system's ("CM/ECF") pagination, rather than the page numbers listed on the actual transcript, which are obstructed by the CM/ECF Bates stamp.

Metals USA operates a metal recycling facility that buys, cuts, and resells different kinds of metals. Dep. of Javier Fleites 21:10-22:24, ECF No. [264-3] ("Fleites Dep."); Dep. of Metals USA's Corp. Representative 13:16-17, ECF No. [264-4] ("Metals Dep."). Lendian owns Metals USA and is involved in every aspect of Metals USA's operation and decision making, including hiring and firing employees, entering into contracts on behalf of the company, and determining the market rate for materials that Metals USA purchases. Fleites Dep. 51:16-25; Metals Dep. 107:19-21; Dep. of Roberto Rodriguez 98:15-17, ECF No. [264-5] ("Rodriguez Dep.").

Around December 2017, Plaintiffs' operations controller, Fritz Gerding, noticed a significant discrepancy between the physical amount of shred inventory stored at the facility and the amount of inventory listed in company records for accounting purposes. Hr'g Tr. 17:2-7; Gerding Dep. 39:14-41:24. Based on this discrepancy, Gerding and Plaintiffs' general manager, Walter Griessier, began an internal investigation to determine the cause of the inventory discrepancy. Hr'g Tr. 17:18-18:3; Gerding Dep. 42:9-16. During their investigation, Gerding and Griessier enlisted the help of another employee at Plaintiffs' facility, Pedro Torres ("Torres"), who they felt would provide valuable knowledge about the facility's systems and operations. Hr'g Tr. 18:17-19:11; Gerding Dep. 42:17-43:10. Torres operated the truck scale to measure the incoming and outgoing weights of vehicles passing through Plaintiffs' facility, which were then used to determine the amount of scrap metal purchased from particular customers. Hr'g Tr. 18:17-19:11. Ultimately, Torres confessed to Gerding and Griessier that he was aware of a theft scheme at Plaintiffs' facility that he had taken part in. Hr'g Tr. 19:16-19; Gerding Dep. 43:10-17. During his confession, Torres implicated numerous other employees who were involved in the theft scheme, including Samuel Abreu. Hr'g Tr. 22:1-6, 25:6-8; Gerding Dep. 58:19-60:11. With Torres's help,

Gerding and Griessier were later able to capture Abreu on video paying Torres an envelope of $3,000.00 in cash. Hr'g Tr. 56:3-16; Gerding Dep. 61:2-64:25.

Abreu worked as a loader operator at Plaintiffs' scrap metals facility from April 2014 to February 2018. Aff. of Samuel Abreu, ECF No. [264-1] ¶ 2 ("Abreu Aff."). In April 2014, Abreu's co-worker, Jose Rodriguez,[6] confided in him that multiple employees at Plaintiffs' facility had been stealing scrap metal. *Id.* ¶ 4. Jose Rodriguez explained that the employees involved would enter the facility with trucks early in the morning, load those trucks with Plaintiffs' scrap metal, and then direct those trucks out of Plaintiffs' facility to deliver the loads of stolen scrap to a location that Abreu later learned was Metals USA. *Id.* ¶¶ 4-5. After learning about the theft scheme, Jose Rodriguez began paying Abreu weekly for his silence, and these payments continued until the end of 2015. *Id.* ¶¶ 6-7. During this time, Jose Rodriguez was the "chief person working at AIM that was in charge of stealing and delivering these stolen goods." Hr'g Tr. 151:23-152:5.

Abreu testified that, at the end of 2015, he was approached by a man named Ruben Encarnacion about taking over for Jose Rodriguez in the theft operation because Jose Rodriguez had become too unreliable. Abreu Aff. ¶ 7; Hr'g Tr. 146:15-147:9. Although he was not employed by Plaintiffs, Encarnacion was a known broker who had previous business interactions at Plaintiffs' facility where he "would broker loads of cars to AIM for shredding." Hr'g Tr. 90:7-9. In early 2016, Encarnacion facilitated an initial in-person meeting between Abreu and Lendian, during which Abreu alleged that Lendian offered him $100.00 for every ton of scrap metal stolen. Abreu Aff. ¶¶ 8-9; Hr'g Tr. 148:9-149:5. Defendants, however, contend that Lendian never instructed Abreu to steal anything, nor did Lendian offer to pay Abreu for Plaintiffs' stolen scrap. Defendants point to Metals USA's Customer History Report, which shows the fluctuating prices

---

[6] In the interest of clarity, the Court will refer to Jose Rodriguez by his full name, whereas Roberto Rodriguez will be referred to as "Rodriguez."

Metals USA paid per ton to Abreu on transactions from January 2015 through December 2017. Aff. of Obed Lendian, ECF No. [272] at 23, ¶ 19 ("Lendian Aff."); ECF No. [264-7] ("Customer History Report"). Thereafter, Abreu took Jose Rodriguez's place as the main orchestrator of the theft scheme at Plaintiffs' facility and involved more employees to expand the operation. Abreu Aff. ¶¶ 10, 12; Hr'g Tr. 151:2-152:5.

Abreu claims that Lendian was the ringleader of the theft ring who controlled all aspects of the scheme and instructed Plaintiffs' employees on when to steal, the quantity to steal, where to deliver the stolen items, and the price of the stolen goods. Hr'g Tr. 100:23-101:13. Defendants, on the other hand, state that Lendian had no knowledge that the materials Abreu delivered were stolen, and that he never instructed Plaintiffs' employees to steal anything, nor did he have any control over the individuals participating in the scheme. Lendian Aff. at 22, ¶¶ 12-15. The employees who confessed their involvement in the theft ring implicated Abreu during their confessions, not Lendian. Hr'g Tr. 24:22-25:8; Gerding Dep. 71:15-72:8.

Defendants disagree with Plaintiffs' characterization of Metals USA's business relationship with Abreu. It is undisputed that Encarnacion was one of Lendian's business contacts who, around the end of 2014, approached Lendian about serving as a broker between Metals USA and a supplier who had scrap metal to sell. Lendian Aff. at 22, ¶¶ 6-7; Fleites Dep. 113:2-12. The supplier Encarnacion brokered for was Abreu. Fleites Dep. 120:10-13; Metals Dep. 27:5-6; Rodriguez Dep. 45:17-19. Pursuant to this agreement, Encarnacion worked as Abreu's broker to deliver loads of ferrous scrap and collect payments on behalf of Abreu's company. Fleites Dep. 121:19-23; Metals Dep. 27:25-28:6; Rodriguez Dep. 46:6-15. Lendian states that, around June 2015, Abreu approached him and told him that Encarnacion would no longer be his broker or have authorization to collect payments on Abreu's behalf. Lendian Aff. at 22, ¶¶ 10-11. Thereafter,

Abreu stopped using Encarnacion as a broker to deliver loads of scrap to Metals USA. Fleites Dep. 121:3-5; Metals Dep. 35:1-3; Rodriguez Dep. 51:3-22.

Plaintiffs contend that Abreu was Metals USA's only customer who delivered material that had been processed through a large industrial shredder. Fleites Dep. 157:9-12, 161:16-19; Metals Dep. 68:10-13. Defendants, however, dispute that the material Abreu was selling to Metals USA was produced by a large industrial shredder, explaining instead that the material "could have been produced by a small shredder. . . . Once metal has been processed through a shredder, it becomes indistinguishable from other metal that has run through a shredder. There is no way to determine the identity or size of the shredder." Lendian Aff. at 25, ¶ 34.

Although it is undisputed that Metals USA did not know the name of Abreu's company, Metals USA employees understood that Abreu owned the company responsible for making the deliveries. Fleites Dep. 119:8-17; Metals Dep. 59:12-16; Rodriguez Dep. 46:12-19 ("Q. How is it that you came to understand that Ruben was working for Samuel Abreu? A. Because Samuel was the owner of the business, the owner of the load. Q. How did you come to know that? Who told you? A. The people themselves who were working there. Guys from Samuel who were coming."). Further, the parties do not dispute that Metals USA never recorded the driver's license information of any of Abreu's drivers, Fleites Dep. 33:7-14, and Defendants maintain that they were not legally required to record such information, Lendian Aff. at 24, ¶ 30; Fleites Dep. 33:7-35:3. Instead, Defendants allege that Metals USA was only required to record the driver's license information for the owner of the material being sold, which it did in Abreu's case, in addition to keeping detailed records of each delivery Abreu made. Lendian Aff. at 24, ¶ 30; Fleites Dep. 33:7-35:3.

Defendants primarily paid Abreu in cash for the loads of scrap sold, although they also occasionally paid Abreu by check. Metals Dep. 55:17-56:2; *see generally* Customer History

Report. Most of Metals USA's largest clients were paid in either cash or check, based on what the owner of the company requested, and payment would be disbursed to the owner of the company or any individuals authorized to collect payment on the owners' behalf. Metals Dep. 53:6-55:7. Either Abreu or an authorized family member went to Metals USA's facility multiple times a week to pick up Abreu's payment. Metals Dep. 55:8-16; Rodriguez Dep. 81:25-82:10. When collecting payment, Abreu would almost always remain in his vehicle outside of the Metals USA yard and either Fleites or Rodriguez would deliver the payment to him. Metals Dep. 52:20-25; Lendian Aff. at 25, ¶ 36; Rodriguez Dep. 84:18-85:2 ("Because he didn't want to get out. At the beginning he got out once or twice but then he did not want to get out so he would remain in his car, well-dressed. And then I would provide him with the money outside. The thing is that our yard has no parking. I would hand him his money, then he would leave.").

It is undisputed that Abreu made a total of 538 deliveries to Metals USA between 2015 and 2018, for which he was paid $4,544,282.95. Fleites Dep. 131:20-132:5; *see generally* Customer History Report. During this period, Abreu was one of Metals USA's five largest clients. Metals Dep. 18:12-15. Metals USA ultimately resold the scrap metal purchased from Abreu to clients domestically and abroad, including to Plaintiffs. Lendian Aff. at 23, ¶ 21; ECF No. [272] at 31-33.

After uncovering the theft ring and obtaining confessions from numerous employees involved, Plaintiffs initiated the instant action on February 9, 2018. ECF No. [1]. Eventually, Abreu began cooperating with the DOJ. Hr'g Tr. 111:24-112:2. Beginning in February 2018, pursuant to this cooperation and unbeknownst to Lendian, Abreu began recording his telephone conversations with Lendian at the DOJ's request. Hr'g Tr. 120:14-18, 161:2-6.

It is undisputed that, during these phone conversations, Lendian suggested that Abreu flee the country rather than face years in prison if convicted for his involvement in the theft ring.[7] ECF No. [264-8] at 18-20. Likewise, the parties do not dispute the fact that Lendian stated that he and Abreu needed to be on the "same page" regarding their testimony as to the quality of the materials Abreu sold to Metals USA. *Id.* at 64, 78. It is further undisputed that Lendian told Abreu not to divulge the identities of the truck drivers who worked for Abreu because they would "give [Abreu] up." *Id.* at 83. Beyond these undisputed facts, however, the parties share differing versions of what transpired.

On the one hand, Plaintiffs set forth the following facts based on the recordings: (1) Lendian started taking steps to transfer his assets out of the United States upon learning of this lawsuit, ECF No. [264-8] at 45; (2) Lendian asked Abreu to lie to his attorney to cover up for Lendian, *id.* at 27-28; (3) Lendian tried to destroy relevant Metals USA records, *id.* at 37; (4) Lendian asked Abreu to take the blame for the thefts and testify that Lendian did not know that the materials were stolen, *id.* at 47, 70; (5) Lendian offered Abreu $20,000.00 for Abreu's legal fees if Abreu agreed to use a lawyer of Lendian's choosing, *id.* at 55, 72-74; and (6) Lendian instructed Abreu to purchase a new cell phone under a false name, ECF No. [264-9] at 2-3.

On the other hand, Defendants contend that the recordings support the existence of issues of fact and present a narrative consistent with their assertions that Defendants neither knew of the thefts, nor directed or participated in them. Defendants also emphasize that these recordings were taken as a result of Abreu's cooperation with, and likely coaching by, the federal officials in an

---

[7] Because Defendants do not dispute, or even address, the following facts in Plaintiffs' SOF concerning the recordings, the Court considers such facts to be admitted. *See* S.D. Fla. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply.").

effort to bait Lendian into making incriminating statements. Defendants dispute the version of facts that Plaintiffs derive from these recordings and allege the following facts instead: (1) Lendian produced his bank records and those records contain no proof that Lendian transferred his assets out of the United States, Lendian Aff. at 29, ¶ 75; (2) The transcript cited by Plaintiffs demonstrates that, contrary to what they allege, it was Abreu who suggested lying to his own attorney, not Lendian, ECF No. [264-8] at 11; (3) The record indicates that it was Abreu who sought to destroy Metals USA records, Rodriguez Dep. 65:1-67:23, and the recording transcript cited shows that Lendian told Abreu that he could not destroy the records in order to avoid a confrontation with someone who Lendian believed could exonerate him, ECF No. [264-8] at 46-47; (4) Lendian spoke with Abreu in an effort to clear his name and the transcript contradicts Plaintiffs' allegations that Lendian asked Abreu to take the blame for the thefts, instead establishing that Abreu suggested that he "bear the guilt for everything," *id.* at 46-47; (5) Lendian offered to help Abreu with his legal fees, but the offer was not conditioned upon a lawyer of Lendian's choosing, and the recording transcript contains no support for this alleged conditional offer, *id.* at 55, 72-74; and (6) There is no indication in the recording transcript cited that Lendian instructed Abreu to purchase a new cell phone under a false name, ECF No. [264-9] at 2-3. Defendants also note that the recordings support the following facts: (1) Neither Lendian nor Abreu indicated that Lendian "orchestrated" the theft scheme, *see generally* ECF Nos. [264-8] & [264-9]; (2) Neither Lendian nor Abreu indicated that Lendian was a "ringleader," *see generally id.*; (3) Neither Lendian nor Abreu indicated that Lendian directed Abreu to steal from Plaintiffs, *see generally id.*; (4) Neither Lendian nor Abreu indicated that Lendian knew the material purchased from Abreu was stolen, *see generally id.*; (5) Neither Lendian nor Abreu suggested that Lendian was responsible for

Abreu's thefts, *see generally id.*; (6) Lendian did not know any of the alleged participants in the theft scheme, *id.* at 65; and (7) Lendian did not know that the materials were stolen, *id.* at 70.

## III. LEGAL STANDARD

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files such a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including, among other things, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48).

A court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge.'" *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1179 (11th Cir. 2019) (quoting *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)); *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *see also Crocker v. Beatty,* 886 F.3d 1132, 1134 (11th Cir. 2018) ("[W]e accept [the non-movant's] version of the facts as true and draw all reasonable inferences in the light most favorable to him as the non-movant."). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the

[non-moving party]." *Anderson*, 477 U.S. at 252. "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 996 (11th Cir. 1990). The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., LLC*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Yet, even where a non-movant neglects to submit any alleged material facts in dispute, a court must still be satisfied that the evidence in the record supports the uncontroverted material facts proposed by the movant before granting summary judgment. *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004) ("*One Piece of Real Prop.*"). Indeed, even "where the parties agree on the basic facts, but disagree about the factual

inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Additionally, "cross motions for summary judgment may be probative of the nonexistence of a factual dispute, but this procedural posture does not automatically empower the court to dispense with the determination whether questions of material fact exist." *Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345-46 (11th Cir. 2015). Indeed, even where the issues presented on motions for summary judgment overlap, a court must consider each motion on its own merits, "resolving all reasonable inferences against the party whose motion is under consideration." *S. Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1243 (N.D. Ga. 2014) (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331). In particular, where "the parties respond[] to each respective summary judgment motion with disputes as to the 'undisputed' facts, add[] 'material facts' of their own, and then repl[y] with subsequent objections to the other party's additional facts," the mere filing of cross motions for summary judgment is not conclusive. *Id.* Thus, where the parties disagree as to the facts, summary judgment cannot be entered unless one of the parties meets its burden of demonstrating that "there is no dispute as to any material facts with the evidence and all inferences drawn therefrom viewed in the light most favorable" to the non-moving party. *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983) (citing *M/V Nan Fung*, 695 F.2d at 1296-97).

## IV. DISCUSSION

Plaintiffs' Motion for Summary Judgment argues that no genuine issue of material fact exists as to any of the elements of their federal and Florida RICO claims in Counts I, II, III, and IV of their Amended Complaint. Plaintiffs' arguments rely in part on adverse inferences derived from Lendian's prior invocation of his Fifth Amendment rights during his deposition, which they

contend the Court should consider instead of Lendian's subsequent affidavit submitted at summary judgment. Defendants, on the other hand, move for summary judgment on all counts of Plaintiffs' Amended Complaint, arguing that Plaintiffs cannot establish the enterprise and continuity elements of their RICO claims and that they cannot establish a benefit conferred by Plaintiffs on their unjust enrichment claim. Defendants' Motion for Summary Judgment relies heavily on the statements set forth in Lendian's affidavit, which they contend the Court may properly consider as a valid withdrawal of a prior Fifth Amendment invocation. Thus, before examining the merits of the Motions, the Court must first address the propriety of the withdrawal of Lendian's Fifth Amendment invocation and his subsequent summary judgment affidavit.

### A. Withdrawal of Lendian's Fifth Amendment Invocation and Supplemental Affidavit

Plaintiffs argue that the Court should draw adverse inferences against Defendants and that Lendian's affidavit should be disregarded for two reasons: (1) Lendian invoked the Fifth Amendment during his testimony at the preliminary injunction hearing and at his deposition and he should not now be allowed to submit an affidavit at summary judgment asserting facts he previously refused to provide, and (2) Lendian's statements in his affidavit are stale, self-serving, conclusory, and have no probative value as competent summary judgment evidence. Defendants argue against drawing adverse inferences, stating that Lendian's affidavit is permissible here because a party may properly withdraw a Fifth Amendment invocation in certain circumstances.

### 1. Fifth Amendment Invocation and Withdrawal

The United States Supreme Court has explained that the Fifth Amendment protects an individual from self-incrimination, in part, by affording the privilege "not to answer official questions put to him in any [] proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Baxter v. Palmigiano*, 425 U.S. 308, 316

(1976) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)); *see also Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 547 (5th Cir. 2012) ("As a preliminary matter, it should be noted that a party may invoke the privilege against self-incrimination in a civil proceeding." (footnote omitted)); *Wehling v. Columbia Broad. Sys.*, 608 F.2d 1084, 1086 (5th Cir. 1979)[8] ("[I]t is clear that the Fifth Amendment would serve as a shield to any party who feared that complying with discovery would expose him to a risk of self-incrimination. The fact that the privilege is raised in a civil proceeding rather than a criminal prosecution does not deprive a party of its protection."). "Accordingly, a party may invoke the Fifth Amendment privilege during the discovery process to avoid answering questions at a deposition, responding to interrogatories or requests for admissions, or to produce documents." *Davis-Lynch, Inc.*, 667 F.3d at 547 (footnote omitted).

"Though constitutionally protected, a civil litigant's invocation of the privilege against self-incrimination during the discovery process is far from costless." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 82 (2d Cir. 1995) ("*Certain Real Prop.*"). "[D]istrict courts possess wide discretion in response to a party's invocation of the Fifth Amendment." *Sec. & Exch. Comm'n v. Monterosso*, 746 F. Supp. 2d 1253, 1262 (S.D. Fla. 2010) (citing *Sec. & Exch. Comm'n v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998); *Wehling*, 608 F.2d at 1089). Further, the Eleventh Circuit has stated that, in a civil action, "the court may draw adverse inferences against a party that invokes the Fifth Amendment." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009); *Arango v. U.S. Dep't of the Treasury*, 115 F.3d 922, 926 (11th Cir. 1997) ("[T]he Fifth Amendment does not forbid adverse inferences against civil litigants . . . who assert the privilege against self-

---

[8] The Court of Appeals for the Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted all decisions of the Court of Appeals for the Fifth Circuit that were rendered prior to October 1, 1981.

incrimination. A party who asserts the privilege may not 'convert [it] from the shield against compulsory self-incrimination which it was intended to be into a sword whereby [he] would be freed from adducing proof in support of a burden which would otherwise have been his.'" (citations omitted)). Accordingly, "a 'party who asserts the privilege against self-incrimination must bear the consequence of lack of evidence,' and the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence to satisfy the usual evidentiary burdens in the litigation." *Certain Real Prop.*, 55 F.3d at 83 (citations omitted).

Nevertheless, the Supreme Court has also emphasized that the Constitution limits "the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.'" *Spevack v. Klein*, 385 U.S. 511, 515 (1967). Moreover, under certain case-specific circumstances, a party may withdraw its invocation of the Fifth Amendment privilege against self-incrimination in a civil case. *See Davis-Lynch, Inc.*, 667 F.3d at 547 ("Courts have weighed the specific facts of each case in which a civil litigant has attempted to withdraw his invocation of the Fifth Amendment privilege."); *Sec. & Exch. Comm'n v. BIH Corp.*, No. 2:10-CV-577-FTM-29, 2013 WL 6571472, at *2 (M.D. Fla. Dec. 13, 2013) ("Withdrawal 'is dependent on the particular facts and circumstances of each case.'" (quoting *Sec. & Exch. Comm'n v. Smart*, 678 F.3d 850, 855 (10th Cir. 2012))). "Given this consideration — and because all parties should have a reasonable opportunity to litigate a civil case fully — courts should seek out ways to permit 'as much testimony as possible to be presented in the civil litigation, despite the assertion of the privilege.'" *Davis-Lynch, Inc.*, 667 F.3d at 547 (quoting *Certain Real Prop.*, 55 F.3d at 84). As such, courts must "carefully balance the interests of the party claiming protection against self-incrimination and the adversary's entitlement to equitable treatment. Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair

and unnecessary prejudice to the other side." *Monterosso*, 746 F. Supp. 2d at 1262 (citations omitted); *Wehling*, 608 F.2d at 1088.

> Generally, "[t]he court should be especially inclined to permit withdrawal of the privilege if there are no grounds for believing that opposing parties suffered undue prejudice from the litigant's later-regretted decision to invoke the Fifth Amendment." Conversely, withdrawal is not permitted if the litigant is trying to "abuse, manipulate or gain an unfair strategic advantage over opposing parties." The timing and circumstances under which a litigant withdraws the privilege are relevant factors in considering whether a litigant is attempting to abuse or gain some unfair advantage.

*Davis-Lynch, Inc.*, 667 F.3d at 547 (footnotes omitted). Thus, "a party may withdraw its assertion of the Fifth Amendment privilege, even at a late stage in litigation, if circumstances indicate that (1) the litigant was not using the privilege in a tactical, abusive manner, and (2) the opposing party would not experience undue prejudice as a result." *Id.* at 548 (citing *Sec. & Exch. Comm'n v. Graystone Nash, Inc.*, 25 F.3d 187, 193 (3d Cir. 1994)).

"In the end, exactly how a trial court should respond to a request to withdraw the privilege — or indeed, more generally, how it should react to any motion precipitated by a litigant's assertion of the Fifth Amendment in a civil proceeding — necessarily depends on the precise facts and circumstances of each case." *Certain Real Prop.*, 55 F.3d at 85. In making this determination, however, courts must be cautious not to, "through inappropriate procedural remedies or unwarranted sanctions, unduly burden litigants' valid attempts to seek the protection that the privilege against self-incrimination provides." *Id.* "Therefore, a party may withdraw its invocation of the Fifth Amendment privilege, even at a late stage in the process, when circumstances indicate that there is no intent to abuse the process or gain an unfair advantage, and there is no unnecessary prejudice to the other side." *Davis-Lynch, Inc.*, 667 F.3d at 548; *Smart*, 678 F.3d at 854-55 ("But 'to prevent a party from converting the Fifth Amendment privilege from its intended use as a shield against compulsory self-incrimination into an offensive sword,' 'a district court may strike

conclusory testimony if the witness asserts the Fifth Amendment privilege to avoid answering relevant questions, yet freely responds to questions that are advantageous to his cause.'" (citing *United States v. $148,840 in U.S. Currency*, 521 F.3d 1268, 1277 (10th Cir. 2008))).

Plaintiffs first argue that the Court should draw adverse inferences against Defendants based on Lendian's prior, repeated Fifth Amendment invocations. Thus, Plaintiffs contend that the Court should disregard Lendian's affidavit because permitting Lendian to submit an affidavit on issues that were previously said to be privileged in order to defeat summary judgment would be prejudicial to Plaintiffs. Defendants argue that Lendian's affidavit is a valid and permissible withdrawal of his prior Fifth Amendment invocation after learning that the DOJ was declining prosecution and closing the pending criminal investigation. Likewise, Defendants state that Lendian is available for a deposition, should Plaintiffs wish to take it instead of continuing to reply on stale adverse inferences.

Although many Circuits across the country have addressed the withdrawal of a prior Fifth Amendment invocation, the Eleventh Circuit has not specifically addressed the issue. *See, e.g.*, *Davis-Lynch, Inc.*, 667 F.3d at 546 n.10 (collecting cases); *Graystone Nash, Inc.*, 25 F.3d at 190-92 (collecting cases). However, "district courts possess wide discretion in response to a party's invocation of the Fifth Amendment." *Monterosso*, 746 F. Supp. 2d at 1262. Moreover, the Fifth Circuit has previously recognized the balance-of-interests approach in responding to parties' Fifth Amendment invocations, explaining that courts should "measure[] the relative weights of the parties' competing interests with a view toward accommodating those interests, if possible . . . [to] ensure[] that the rights of both parties are taken into consideration before the court decides whose rights predominate." *Wehling*, 608 F.2d at 1088; *Graystone Nash, Inc.*, 25 F.3d at 191 ("In a civil trial, a party's invocation of the privilege may be proper, but it does not take place in a vacuum;

the rights of the other litigant are entitled to consideration as well."). More recently, in *Davis-Lynch, Inc.*, the Fifth Circuit synthesized the analysis from other Circuits "on whether and under what circumstances a party may withdraw its invocation of the Fifth Amendment privilege against self incrimination in a civil case." 667 F.3d at 546.

> Generally, '[t]he court should be especially inclined to permit withdrawal of the privilege if there are no grounds for believing that opposing parties suffered undue prejudice from the litigant's later-regretted decision to invoke the Fifth Amendment.' Conversely, withdrawal is not permitted if the litigant is trying to 'abuse, manipulate or gain an unfair strategic advantage over opposing parties.' The timing and circumstances under which a litigant withdraws the privilege are relevant factors in considering whether a litigant is attempting to abuse or gain some unfair advantage.
>
> For example, some Circuits have not allowed a litigant to withdraw the privilege when he invoked the privilege throughout discovery and then sought to withdraw the privilege either to support or defend against a motion for summary judgment . . . .
>
> On the other hand, a party may withdraw its assertion of the Fifth Amendment privilege, even at a late stage in litigation, if circumstances indicate that (1) the litigant was not using the privilege in a tactical, abusive manner, and (2) the opposing party would not experience undue prejudice as a result . . . .
>
> . . . Therefore, a party may withdraw its invocation of the Fifth Amendment privilege, even at a late stage in the process, when circumstances indicate that there is no intent to abuse the process or gain an unfair advantage, and there is no unnecessary prejudice to the other side.

*Id.* at 547-48 (footnotes omitted); *see also BIH Corp.*, 2013 WL 6571472, at *2 (applying *Davis-Lynch, Inc.*'s analysis).

Accordingly, courts have granted adverse inferences against parties who invoke their Fifth Amendment privileges and later withdraw these privileges in an attempt to game the system. *Monterosso*, 746 F. Supp. 2d at 1262-64. Similarly, courts have stricken parties' subsequent testimony after the withdrawal of a prior Fifth Amendment invocation. *In re Edmond*, 934 F.2d 1304, 1308-09 (4th Cir. 1991); *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990); *BIH Corp.*, 2013 WL 6571472, at *2-3. Furthermore, courts have permitted parties to withdraw a Fifth Amendment invocation, where the invocation was not done to gain an unfair advantage and

there was no undue prejudice to the opposing party. *Davis-Lynch, Inc.*, 667 F.3d at 548-49; *Graystone Nash, Inc.*, 25 F.3d at 193-94. "In the end, exactly how a trial court should respond to a request to withdraw the privilege — or indeed, more generally, how it should react to any motion precipitated by a litigant's assertion of the Fifth Amendment in a civil proceeding — necessarily depends on the precise facts and circumstances of each case." *Certain Real Prop.*, 55 F.3d at 85; *Graystone Nash, Inc.*, 25 F.3d at 192 ("This brief survey of case law makes it apparent that the effects that an invocation of the privilege against self-incrimination will have in a civil suit depends to a large extent on the circumstances of the particular litigation.").

Here, Defendants learned of the DOJ's criminal investigation in August 2018. ECF No. [122] at 1. On September 7, 2018, Lendian testified at a hearing on Plaintiffs' Motion for Preliminary Injunction, where he, for the first time, asserted his Fifth Amendment rights. ECF No. [264-2] at 186-201. On December 1, 2018, Lendian was deposed in his individual capacity, and again invoked the protections of the Fifth Amendment. ECF No. [264-6]. On February 15, 2019, Plaintiffs filed their initial Motion for Partial Summary Judgment as to Liability. ECF No. [120]. On March 1, 2019, Defendants filed a Motion for Temporary Stay pending the potential criminal prosecution, ECF No. [122], which the Court granted on April 4, 2019, ECF No. [146]. On August 26, 2019, Defendants were informed that the DOJ did not intend to prosecute them and that it had closed its criminal investigation into Defendants. ECF No. [151] at 1. On August 28, 2019, this Court lifted the stay. ECF No. [154]. In lifting the stay, this Court set the deadline to complete all discovery for September 27, 2019. ECF No. [154].

Relevant to the issue of when Lendian first withdrew his prior Fifth Amendment invocation and submitted the affidavit in question, on August 29, 2019, Plaintiffs filed their first Renewed Motion for Partial Summary Judgment, ECF No. [158], incorporating the Statement of Material

Facts from their original Motion, ECF No. [119]. On September 12, 2019, Defendants filed their Response in Opposition to Plaintiffs' Motion for Summary Judgment, ECF No. [165], and their Counterstatement of Material Facts, ECF No. [166]. Defendants' Counterstatement of Material Facts included, for the first time, Lendian's affidavit as an exhibit. ECF No. [166-1].

Defendants state that, immediately upon learning that the criminal investigation was closed, Lendian agreed to make himself available to be re-deposed any time before trial. ECF No. [267] at 5 & n.1. Thus, the Court must determine whether Lendian's withdrawal of his prior Fifth Amendment invocation in his affidavit was warranted, or whether the Court should draw adverse inferences from Lendian's prior Fifth Amendment invocation.

As explained above, there are two primary inquiries that courts must address when determining whether to permit a party to withdraw a prior invocation of the Fifth Amendment — namely, "a party may withdraw its assertion of the Fifth Amendment privilege, even at a late stage in litigation, if circumstances indicate that (1) the litigant was not using the privilege in a tactical, abusive manner, and (2) the opposing party would not experience undue prejudice as a result." *Davis-Lynch, Inc.*, 667 F.3d at 548 (citing *Graystone Nash, Inc.*, 25 F.3d at 193).

The Court concludes that Lendian's invocation and subsequent withdrawal of his Fifth Amendment protections was not done for the purpose of abusing the judicial system. Specifically, the unusual facts and timing of events in this case weigh heavily against Defendants' alleged intent to gain an unfair advantage in the case. The timeline of the proceedings during the course of this litigation suggest that Lendian validly sought constitutional protections through his Fifth Amendment invocation, based on the belief that Defendants were under threat of criminal prosecution by the DOJ. *See* ECF No. [122]. Moreover, immediately upon learning that the criminal investigation was closed, Defendants apparently notified Plaintiffs that Lendian would

agree to be re-deposed at any point before trial and further withdrew the prior Fifth Amendment invocation by submitting his affidavit in response to Plaintiffs' Motion for Summary Judgment. ECF No. [267] at 5 & n.1; *see Davis-Lynch, Inc.*, 667 F.3d at 548 ("The timing and circumstances under which a litigant withdraws the privilege are relevant factors in considering whether a litigant is attempting to abuse or gain some unfair advantage."); *id.* at 548 (discussing case permitting parties to withdraw Fifth Amendment invocations because withdrawal was done around the time the criminal prosecution was wrapping up (citing *Evans v. City of Chicago*, 513 F.3d 735, 746 (7th Cir. 2008))); *In re Edmond*, 934 F.2d at 1308-09 (holding that selective assertion of Fifth Amendment privilege to thwart opposing party's ability to take deposition testimony then use of that testimony to defeat summary judgment was improper); *Monterosso*, 746 F. Supp. 2d at 1262 ("Courts should 'give due consideration to the nature of the proceeding, how and when the privilege was invoked, and the potential for harm or prejudice to opposing parties.'" (citation omitted)). Lendian's willingness to sit for a supplemental deposition indicates that Defendants' did not invoke the Fifth Amendment to abuse the litigation process. These facts strongly contradict any suspected intent of Defendants to manipulate these proceedings to gain an unfair advantage.

Moreover, regarding any prejudice to Plaintiffs, the Court notes that this prejudice is likely outweighed by the fact that (1) Defendants informed Plaintiffs that Lendian was willing to be re-deposed, upon learning that the criminal investigation was closed, which came weeks before the discovery deadline, and (2) permitting Lendian's affidavit allows the parties to present as much testimony as possible in the instant litigation. *See Davis-Lynch, Inc.*, 667 F.3d at 549; *Certain Real Prop.*, 55 F.3d at 84. Although "opposing parties will frequently suffer prejudice (at the very least from increased costs and delays) when a litigant relies on the Fifth Amendment during discovery and then decides to waive the privilege much later in the proceeding," *Certain Real Prop.*, 55 F.3d

at 86, this prejudice must nonetheless be weighed against the interests of the party claiming the protection, *Graystone Nash, Inc.*, 25 F.3d at 192. Furthermore, the withdrawal of a prior Fifth Amendment invocation alone, even at a late stage in the proceedings, is insufficient to establish undue prejudice, especially where, as here, the opposing party still had an opportunity to investigate during the discovery period. *See id.* at 191-92 (collecting cases); *Davis-Lynch, Inc.*, 667 F.3d at 548-49; *Evans*, 513 F.3d at 746; *BIH Corp.*, 2013 WL 6571472, at \*2-3.

The Court therefore concludes that, as it concerns Lendian's withdrawal of his Fifth Amendment invocation and Plaintiffs' potential prejudice, the balance of the parties' interests weighs in favor of permitting Lendian to withdraw his prior Fifth Amendment invocation and submit his affidavit on the merits. Accordingly, the Court concludes that Lendian's withdrawal of his previous Fifth Amendment invocation is permissible here. *See Monterosso*, 746 F. Supp. 2d at 1262 ("[D]istrict courts possess wide discretion in response to a party's invocation of the Fifth Amendment."); *Certain Real Prop.*, 55 F.3d at 85 n.7 ("A trial court's authority [to respond to parties' Fifth Amendment invocations] stems from its broad discretion to control and to fashion remedies for abuses of the discovery process."); *Graystone Nash, Inc.*, 25 F.3d at 194 ("The imposition of an appropriate remedy [for the withdrawal of a party's Fifth Amendment privilege] is within the discretion of the trial court.").

### 2. Sufficiency of Rule 56 Affidavits

With regard to motions for summary judgment, under Federal Rule of Civil Procedure 56, a party alleging the absence or presence of a genuine dispute as to a particular fact must support their allegation by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

materials." Fed. R. Civ. P. 56(c)(1)(A). Moreover, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Under Rule 56, affidavits based on conclusory allegations, rather than statements of fact based on personal knowledge, are improper. Fed. R. Civ. P. 56(e). Thus, when a party submits "[s]worn statements which fail to meet the standards set forth in Rule 56(e)," a court "*may strike or disregard* the improper portions and consider the remainder of the testimony or statement." *Dortch v. City of Montgomery*, No. 07-cv-1034-MEF, 2009 WL 959638, at *1 (M.D. Ala. Apr. 8, 2009) (citing *Thomas v. Ala. Council on Human Relations, Inc.*, 248 F. Supp. 2d 1105, 1112 (M.D. Ala. 2003)).

"Once the moving party makes the required [summary judgment] showing, the burden shifts to the non-moving party to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011). "[O]ne who resists summary judgment must meet the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial." *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (quoting *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978)). "All affidavits must be based on personal knowledge and must set forth facts that would be admissible under the Federal Rules of Evidence." *Josendis*, 662 F.3d at 1315; *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion. Moreover, statements in affidavits that are based, in part, upon information and belief, cannot raise genuine issues of fact, and thus also cannot defeat a motion for summary judgment." (citations omitted)); *Walace v. Cousins*, No. 18-10267, 2019 WL 3819299, at *3 (11th

Cir. Aug. 15, 2019) ("[A]n affidavit that fails to support its assertions 'with[] specific supporting facts [has] no probative value.'" (quoting *Leigh*, 212 F.3d at 1217)).

"An affidavit cannot be conclusory, but nothing in Rule 56 (or, for that matter, in the Federal Rules of Civil Procedure) prohibits an affidavit from being self-serving. Indeed[,] . . . 'most affidavits submitted [in response to a summary judgment motion] are self-serving.'" *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018) (citations omitted); *see id.* ("a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment"). "Nor does Rule 56 require that an otherwise admissible affidavit be corroborated by independent evidence." *Id.* at 858. As such, "[a] non-conclusory affidavit which complies with Rule 56 can create a genuine dispute concerning an issue of material fact, even if it is self-serving and/or uncorroborated." *Id.* at 858-59.

In their Reply, Plaintiffs argue that Lendian's affidavit should be disregarded because it is based on self-serving, conclusory statements, which are improper evidence on a motion for summary judgment and which nevertheless do not create any genuine issues of material fact. ECF No. [275] at 5-7. Likewise, Plaintiffs argue that the affidavit is untimely and prejudicial, given Lendian's prior Fifth Amendment invocation, and that it is predicated on stale and unintelligible statements responding to Plaintiffs' prior Statement of Material Facts, ECF No. [119], that have no probative value. ECF No. [275] at 7-8.

"The rule is settled that on a motion for summary judgment a court will disregard only the inadmissible portions of a challenged affidavit offered in support of or opposition to the motion and will consider the admissible portions in determining whether to grant or deny the motion." *Lee v. Nat'l Life Assurance Co. of Can.*, 632 F.2d 524, 529 (5th Cir. 1980); *see also Givhan v. Elec. Eng'rs, Inc.*, 4 F. Supp. 2d 1331, 1334 n.2 (M.D. Ala. 1998) ("The court may strike or disregard

the inadmissible portions and consider the rest of the affidavit." (citing *S. Concrete Co. v. U.S. Steel Corp.*, 394 F. Supp. 362, 380 (N.D. Ga. 1975))). As discussed at length above, the Court determined that Lendian's withdrawal of his prior Fifth Amendment invocation was permissible. Thus, even if Plaintiffs are correct in arguing that some of the allegations in Lendian's affidavit are conclusory, stale, or improper, the Court is "capable of sifting evidence, as required by the summary-judgment standard." *Reeves-Howard v. S. Union State Cmty. Coll.*, No. 07-cv-967-MHT, 2009 WL 1442059, at *1 (M.D. Ala. May 20, 2009). As such, to the extent that it is necessary, the Court will "disregard [any] improper portions [of Lendian's affidavit] and consider the remainder of the testimony or statement." *Dortch*, 2009 WL 959638, at *1.

### B. Plaintiffs' Renewed Motion for Partial Summary Judgment as to Liability

Plaintiffs move for summary judgment on their federal and Florida RICO claims in Counts I, II, III, and IV of their Amended Complaint. Specifically, Plaintiffs argue that there are no genuine issues of material fact on any of the five elements of their general RICO claims under either federal or Florida law. Neither, Plaintiffs contend, are there any genuine issues of fact as to the elements required to establish their federal and Florida RICO conspiracy claims. In opposition, Defendants argue that genuine issues of material fact exist as to their statute of limitations affirmative defense. Moreover, Defendants assert that Plaintiffs have failed to sufficiently establish the enterprise and continuity elements of their RICO claims under Counts I through IV. In reply, Plaintiffs allege that no genuine issues of material fact exist as to Defendants' statute of limitations affirmative defense because additional predicate acts restart the statute of limitations.

As explained in detail above, the Court concludes that Lendian's withdrawal of his Fifth Amendment invocation was valid under the circumstances of this case. To the extent that certain allegations in Lendian's affidavit are improper, stale, or conclusory, the Court will disregard these

allegations as needed. Further, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. Nevertheless, if, in the Court's consideration of the translated recordings, the "opposing parties tell two different stories, one of which is *blatantly contradicted* by the record, so that no reasonable jury could believe it, [the] [C]ourt should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added).[9] "If the record does not blatantly contradict the nonmovant's version of events, the court must determine 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" *Witter v. Bank of Am.*, No. 1:07-CV-1344-GET-AJB, 2008 WL 11470984, at *5 (N.D. Ga. May 15, 2008) (quoting *Anderson*, 477 U.S. at 252), *report and recommendation adopted*, 2008 WL 11470997, at *1 (N.D. Ga. June 12, 2008); *EPL Inc. v. USA Fed. Credit Union*, 173 F.3d 1356, 1362 (11th Cir. 1999).

### 1. Federal and Florida Civil RICO Claims (Counts I and III)

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity," under § 1961(1)(B), includes

---

[9] Here, there appears to be no dispute between the parties that the transcripts are true and accurate translations of the recordings. "Generally, documents must be properly authenticated in order for them to be considered on summary judgment. However, it makes sense that unauthenticated documents may be considered when no objection is made or when it is apparent that those documents can be reduced to admissible, authenticated form at trial." *Bozeman v. Orum*, 199 F. Supp. 2d 1216, 1222 (M.D. Ala. 2002). Because the authenticity of these recordings is not in dispute in this case, the Court will consider them. *See U.S. Aviation Underwriters, Inc. v. Yellow Freight Sys., Inc.*, 296 F. Supp. 2d 1322, 1327 n.2 (S.D. Ala. 2003) ("[A]s such, it is apparent that this document can be reduced to admissible, authenticated form at trial, and the Court will consider it on that basis.").

"any act which is indictable under [18 U.S.C. § 2314] (relating to interstate transportation of stolen property)." *Id.* § 1961(1)(B).[10]

To assert a RICO[11] claim, a plaintiff "must establish that a defendant (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two racketeering acts." *Ray v. Spirit Airlines, Inc.*, 767 F.3d 1220, 1224 (11th Cir. 2014) ("*Ray I*"). "A civil plaintiff must also show '(1) the requisite injury to "business or property," and (2) that such injury was "by reason of" the substantive RICO violation.'" *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1348 (11th Cir. 2016) ("*Ray II*") (quoting *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282-83 (11th Cir. 2006), *abrogated on other grounds as recognized in Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 714-15 (11th Cir. 2014)). Because the Court concludes that the enterprise element is dispositive here, it will address that element first.

Section 1961(4) broadly defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A] RICO enterprise need not possess an 'ascertainable structure' distinct from the associations necessary to conduct the pattern of

---

[10] Section 2314 makes it unlawful to "transport[], transmit[], or transfer[] in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." 18 U.S.C. § 2314. Further, under Florida law, "'[r]acketeering activity' means to commit, to attempt to commit, to conspire to commit, or to solicit, coerce, or intimidate another person to commit: . . . . [a]ny conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)." Fla. Stat. § 895.02(8).

[11] The Eleventh Circuit has explained that "interpretation of Florida's RICO law 'is informed by case law interpreting the federal RICO statute . . . on which Chapter 772 is patterned.'" *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1264 (11th Cir. 2004) (quoting *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994)). Because "Florida courts often look to the Federal RICO decisions for guidance in interpreting and applying the act," the Eleventh Circuit has stated that the analysis for federal RICO claims is equally applicable to state RICO claims. *Id.* at 1263-64. Any differences between the interpretation of the federal and Florida RICO provisions shall be specifically noted. For example, Florida's RICO law does not include an interstate commerce component. *See* Fla. Stat. § 772.103 ("It is unlawful for any person: . . . . (3) Employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity or the collection of an unlawful debt.").

racketeering activity." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1274-75 (11th Cir. 2000). Instead, the Supreme Court has explained that the existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Thus, "the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation." *Goldin Indus., Inc.*, 219 F.3d at 1275.

The definition of an enterprise in the RICO statute is broadly worded to include associations in fact. *Boyle v. United States*, 556 U.S. 938, 944 (2009). As such, "the Supreme Court has 'succinctly' defined an association-in-fact enterprise as any 'group of persons associated together for a common purpose of engaging in a course of conduct.'" *Al-Rayes v. Willingham*, 914 F.3d 1302, 1307 (11th Cir. 2019) (citing *Boyle*, 556 U.S. at 944; *Turkette*, 452 U.S. at 583). Although the "'concept of an association in fact is expansive,' the Supreme Court has nevertheless found that an association-in-fact enterprise must have three 'structural features': (1) a 'purpose,' (2) 'relationships among those associated with the enterprise,' and (3) 'longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (quoting *Boyle*, 556 U.S. at 944); *United States v. Elliot*, 571 F.2d 880, 898 (5th Cir. 1978) ("In defining 'enterprise', Congress made clear that the statute extended beyond conventional business organizations to reach 'any . . . group of individuals' whose association, however loose or informal, furnishes a vehicle for the commission of two or more predicate crimes.").

"That an 'enterprise' must have a purpose is apparent from the meaning of the term in ordinary usage, i.e., a 'venture,' 'undertaking,' or 'project.'" *Boyle*, 556 U.S. at 946 (quoting Webster's Third New International Dictionary 757 (1976)). "Thus, the 'concept of "associat[ion]" requires both interpersonal relationships and a common interest.'" *Al-Rayes*, 914 F.3d at 1308 (quoting *Boyle*, 556 U.S. at 946). To satisfy the "common purpose" requirement for a RICO enterprise, a plaintiff must establish "not only that there was some commonly shared purpose among [the alleged associates], but also that they *associated together* for that purpose." *Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1362 (M.D. Fla. 2005).

The Eleventh Circuit has held that a "group of persons who had committed a variety of unrelated offenses with no agreement as to any particular crime could be convicted of a RICO offense, because they were associated for the purpose of making money from repeated criminal activity." *United States v. Cagnina*, 697 F.2d 915, 920-21 (11th Cir. 1983). However, "[i]f [an] association-in-fact enterprise does not have sufficient relationships among Defendants as associates, it lacks the structure needed to be legally cognizable." *Almanza*, 851 F.3d at 1067-68. In order to prove sufficient relationships for an associated-in-fact enterprise, "the group must function as a continuing *unit*," not merely through independent, parallel conduct. *Boyle*, 556 U.S. at 948 (emphasis added); *Almanza*, 851 F.3d at 1068.

Additionally, where a business is alleged to be involved in a RICO enterprise, there must be evidence of some activity that goes beyond general, self-interested business activity, and this requirement also applies in cases where "the individuals making up the enterprise acted fraudulently in pursuing their own business interests." *Cisneros v. Petland, Inc.*, 341 F. Supp. 3d 1365, 1373-74 (N.D. Ga. 2018) (citing *Parm v. Nat'l Bank of Cal. N.A.*, 242 F. Supp. 3d 1321, 1347 (N.D. Ga. 2017) (finding that the allegations were "more consistent with [the] Defendant

conducting its own business initiatives" and were therefore "not sufficient to plead a RICO enterprise"); *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013) (noting the lack of support for the proposition "that these communications or actions were undertaken on behalf of the enterprise as opposed to on behalf of Walgreens and Par in their individual capacities, to advance their individual self-interests")); *see also Parm*, 242 F. Supp. 3d at 1347 ("Even if Defendant used fraudulent means to carry out those activities, the activities constituted Defendant's own business affairs, not acts to further the goals of a separate enterprise."); *Singh v. NYCTL 2009-A Tr.*, 14 Civ. 2558, 2016 WL 3962009, at *10 (S.D.N.Y. July 10, 2016) ("the mere existence of routine business relationships among the defendants is insufficient to establish an 'enterprise' under RICO"). Thus, the question of whether a defendant's business activities were conducted in furtherance of its own interests or in furtherance of the goals of a separate enterprise is a question of fact.

In the instant action, Plaintiffs argue that there exists no genuine issue of material fact as to Defendants' association-in-fact enterprise because (1) Defendants' enterprise existed for the purpose of stealing Plaintiffs' scrap metal; (2) Lendian decided and coordinated all aspects of the thefts; and (3) the enterprise operated continuously for almost four years. Defendants Response argues that Plaintiffs have failed to present any evidence that the association exists for a purpose other than to commit the predicate acts, as they believe is required for a RICO enterprise.

As an initial matter, the Court notes that Defendants mischaracterize the law with regard to establishing the enterprise element of a RICO claim. *Turkette* does not stand for the proposition that, to prove the existence of a RICO enterprise, an association must always exist for a purpose other than to commit the predicate acts, as Defendants contend. Instead, the Supreme Court in *Turkette* held that the "enterprise" element of a RICO claim is separate and distinct from the

"pattern of racketeering activity" element. 452 U.S. at 583. Specifically, the Supreme Court explained that, to assert a RICO claim, a plaintiff "must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.'" *Id.*

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the [plaintiff].

*Id.* (citation omitted) (footnote omitted). The Court, in *Boyle*, elaborated on its reasoning in *Turkette*, noting that, although "the existence of an enterprise is a separate element [from the pattern of racketeering activity] that must be proved," *Boyle*, 556 U.S. at 947, and "proof of one does not necessarily establish the other," *Turkette*, 452 U.S. at 583, this does not mean "that the existence of an enterprise may never be inferred from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity," *Boyle*, 556 U.S. at 947.

> This interpretation of *Turkette* is consistent with the law in this Circuit:
>
> [A] RICO enterprise need not possess an "ascertainable structure" distinct from the associations necessary to conduct the pattern of racketeering activity. [*United States v. Weinstein*, 762 F.2d 1522, 1537 n.13 (11th Cir. 1985)] (rejecting the holding in *United States v. Bledsoe*, 674 F.2d 647, 665 (8th Cir. 1982), requiring that the enterprise possess such a structure, distinct from the pattern of racketeering activities).
> . . . . We have held that *Turkette* left intact this Circuit's holding in *United States v. Elliott*, 571 F.2d 880 (5th Cir. 1978), that the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation. *Id.* at 898. *See also United States v. Hewes*, 729 F.2d 1302, 1311 (11th Cir. 1984) ("a RICO enterprise exists where a group of persons associates, formally or informally, with the purpose of conducting illegal

activity"); *United States v. Cagnina*, 697 F.2d 915, 920-21 (11th Cir. 1983) (upholding Cagnina's RICO conviction for his participation in an "informal criminal network engaged in racketeering activity").

*Goldin Indus., Inc.*, 219 F.3d at 1274-75 (footnote omitted). Thus, the Court rejects Defendants' reading of *Turkette* and concludes instead that the Supreme Court's opinion stands for the proposition that the RICO elements of "enterprise" and "pattern of racketeering activity" are separate elements that must each be separately proven. 452 U.S. at 583.

On the merits, however, the Court concludes that Plaintiffs' Motion for Summary Judgment must be denied because genuine issues of material fact still exist on the enterprise element. Record evidence supports an alternative, legitimate narrative of facts indicating that Defendants' relationship with Abreu was a normal, self-interested business relationship entirely independent of the theft ring. *See Reese*, 527 F.3d at 1268-69 (explaining that, on summary judgment, the movant's facts and the other evidentiary facts in the record must demonstrate the absence of any genuine issue of material fact, and "the court must satisfy itself that the [movant's] burden has been satisfactorily discharged"). In particular, although Abreu's testimony alleges that Defendants devised the scheme to steal scrap metal from Plaintiffs' facility and that Lendian was the ringleader of the theft ring, controlling all aspects of the operation, Hr'g Tr. 100:23-101:13; Abreu Aff. ¶¶ 11, 20, other evidentiary facts in the record contradict Defendants' involvement in the theft scheme. *Lewis*, 934 F.3d at 1179 (explaining that a court views the facts in the light most favorable to the non-moving party, draws "all reasonable inferences in favor of the nonmovant and may not weigh evidence or make credibility determinations, which 'are jury functions, not those of a judge'" (citation omitted)).

Defendants state that their interactions and transactions with Abreu were pursuant to a legitimate business relationship. Fleites Dep. 113:2-12, 120:10-13; Metals Dep. 27:5-6; Rodriguez Dep. 45:17-19; Lendian Aff. at 22, ¶¶ 6-7. Encarnacion was known at Plaintiffs' facility as

someone who "would broker loads of cars to AIM for shredding," based on his previous business interactions with Plaintiffs, Hr'g Tr. 90:7-9, and Defendants explain that Encarnacion was one of Lendian's business contacts who, around the end of 2014, approached Lendian about serving as a broker between Metals USA and a supplier who had scrap metal to sell. Fleites Dep. 113:2-12; Lendian Aff. at 22, ¶¶ 6-7; ECF No. [264-8] at 66-67 (Abreu: "[Ruben] was the one that introduced us."). Eventually, Encarnacion began working as Abreu's broker to deliver loads of ferrous scrap and collect payments on behalf of Abreu's company until Abreu took over. Fleites Dep. 121:19-23; Metals Dep. 27:25-28:6; Rodriguez Dep. 46:6-15; Lendian Aff. at 22, ¶¶ 10-11.

Defendants allege that Lendian never instructed Abreu to steal anything, nor did he offer to pay Abreu $100.00 for every ton of Plaintiffs' stolen scrap, pointing to Metals USA's Customer History Report, which shows the fluctuating prices Metals USA paid per ton to Abreu in transactions from January 2015 to December 2017. Lendian Aff. at 23, ¶ 19; *see generally* Customer History Report. Defendants also assert that, contrary to Abreu's affidavit and Plaintiffs' allegations, Lendian had no knowledge that the materials Abreu delivered were stolen and that he never instructed Plaintiffs' employees to steal anything, nor did he have any control over the individuals participating in the theft scheme. Lendian Aff. at 23, ¶¶ 12-15.[12]

---

[12] Statements in the recordings of the phone calls between Lendian and Abreu warrant inferences that Defendants had no knowledge of the thefts, no direction or control over the scheme's participants, and no involvement in the theft ring. ECF No. [264-8] at 12 (Lendian: "I told [Ruben], 'Listen, I'm going to pay you with a check, if something comes up . . . I bought this legally.'"); *id.* at 17 (Lendian: "And I didn't know anything and let alone about Jose, and that's the truth, you hear? I never met that Jose."); *id.* at 46 (Lendian: "You have quite a complication there with the tickets. Because it's a lot of money. Well, we both have a problem. My only alibi is that I didn't know, you know? That it was stolen."); *id.* at 65 (Lendian: "I don't even know [the drivers]." Abreu: "And you don't know anyone."); *id.* at 69 (Lendian: "I didn't know Pedro was with you either . . . this just came up."); *id.* at 75-76 (Lendian: "[Plaintiffs] are saying that I knew that the material was stolen because I was buying material too cheap from you. Which is a lie because they even bought it from me too. And they also bought it cheap. Because I had no way of exporting it, I didn't have the connections."). "If more than one inference could be construed from the facts by a reasonable fact finder, and that inference introduces a genuine issue of material fact, then the district court should not grant summary judgment." *Bannum, Inc.*, 901 F.2d at 996.

Moreover, the recording transcripts do not dispel the issues of material fact, especially where, as here, the audio recordings of the conversations themselves would likely be subject to differing interpretations, given the tone and context.[13] Rather, these recordings introduce further factual disputes that support the denial of Plaintiffs' Motion for Summary Judgment. Notably, the recordings do not contain any express and unambiguous statements by Lendian indicating that he participated in, directed, controlled, or managed the affairs of the theft ring or its participants. *See generally* ECF Nos. [264-8] & [264-9]. Nor do the recordings irrefutably establish that Defendants knew of Abreu's ongoing theft scheme and purchased the stolen scrap metal in furtherance of that scheme. *See generally id.* Any conclusions that can be drawn from the transcripts of these recordings should be drawn in Defendants' favor at the summary judgment stage. Likewise, on summary judgment, this Court cannot rely on certain witness statements to demonstrate the absence of any issues of material fact where the record contains contradictory witness testimony. *See Lewis*, 934 F.3d at 1179 (a court "may not weigh evidence or make credibility determinations" on a motion for summary judgment). Here, Abreu and Lendian present conflicting testimony on material facts, such as Defendants' knowledge of and participation in the theft ring, which are further muddled by the recording transcripts. Granting summary judgment despite the existence of

---

[13] "When opposing parties tell two different stories, one of which is *blatantly contradicted* by the record, so that no reasonable jury could believe it, [the] [C]ourt should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (emphasis added). Importantly though, the recording at issue in *Scott* was a video recording, which so obviously contradicted the opposition's version of facts that no reasonable jury could believe them. *Id.* at 378-80. Here, however, the alleged "blatant contradictions" are based on inferences and implications derived from translated transcripts of audio recordings, which present significantly greater issues of ambiguity and varying interpretations. This is not the type of blatant, objectively contradictory evidence that was before the Court in *Scott*. *Cf.* 550 U.S. at 378-79. "If the record does not blatantly contradict the nonmovant's version of events, the court must determine 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" *Witter*, 2008 WL 11470984, at *5 (quoting *Anderson*, 477 U.S. at 252).

such conflicting testimony would require the Court to usurp the functions of a jury to weigh evidence and make credibility determinations. *See id.*

Accepting Defendants' version of the facts as true and drawing all reasonable inferences in the light most favorable to them, the Court concludes that there are genuine disputes as to the material facts establishing that Defendants were associated with the enterprise and acted in support of the enterprise's common purpose to steal Plaintiffs' scrap metal. *See Lewis*, 934 F.3d at 1179; *Crocker*, 886 F.3d at 1134. The record evidence supports Defendants' assertion that, by purchasing Abreu's scrap metal pursuant to their legitimate business relationship, Defendants were conducting their routine business affairs. *See, e.g.*, Lendian Aff. at 26, ¶ 52 ("on occasion Abreu would refuse to deliver material to Metals USA because he did not like the prevailing market price per ton"). Moreover, the evidence in the record supports the allegation that Defendants purchased scrap metal from Abreu's purported company pursuant to what they believed to be a legitimate business relationship independent from the theft ring that was initially facilitated by Lendian's business contact and known broker, Encarnacion. Fleites Dep. 113:2-12, 120:10-13; Metals Dep. 27:5-6; Rodriguez Dep. 45:17-19; Lendian Aff. at 22, ¶¶ 6-7; ECF No. [264-8] at 66-67. There is also evidentiary support for the assertion that Lendian had no involvement in, direction of, or control over the theft operation at Plaintiffs' facility. Hr'g Tr. 24:22-25:8 (that Plaintiffs' employees only named Abreu, not Lendian, in their confessions); Gerding Dep. at 71:15-72:8 (same); Hr'g Tr. at 56:3-57:14 (that Abreu was caught on video giving Plaintiffs' employees envelopes of cash); Gerding Dep. 61:2-64:25 (same); ECF No. [264-8] at 17 (that Lendian had never met Jose Rodriguez); *id.* at 65 (that Lendian did not "know anyone"); *id.* at 69 (that Lendian did not know Pedro worked with Abreu). This evidence, and the inferences drawn from this evidence, presents genuine issues of material fact as to whether Defendants operated as a continuing unit with the

theft ring participants for the common purpose of stealing Plaintiffs' scrap metal. Thus, Plaintiffs

have not met their burden of establishing the existence of a RICO enterprise here. Accordingly,

Plaintiffs' Motion for Summary Judgment on their substantive RICO claims is denied.

**2. Federal and Florida Civil RICO Conspiracy Claims (Counts II and IV)**

With regard to a civil RICO conspiracy claim, § 1962(d) makes it "unlawful for any person

to conspire to violate any of the [RICO] provisions." 18 U.S.C. § 1962(d). "A plaintiff can establish

a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the

overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two

predicate acts." *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th

Cir. 1997). Thus, "[t]he touchstone of liability is an agreement to participate in a RICO

conspiracy." *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007); *O'Malley v. O'Neill*,

887 F.2d 1557, 1560 (11th Cir. 1989) (explaining that, to assert a RICO conspiracy claim, facts

must be alleged "that would indicate that [defendants] were willing participants in a conspiracy").

> Because there are fewer proof requirements under § 1962(d) than under the
> substantive RICO offenses — most notably, through the absence of the requirement
> of an overt act — the conspiracy offense reaches a wider range of conduct. A
> defendant may be guilty of conspiracy even if he did not commit the substantive
> acts that could constitute violations of §§ 1962(a), (b), or (c). . . . "If [a party] can
> prove an agreement on an overall objective, it need not prove a defendant
> personally agreed to commit two predicate acts." In the absence of direct evidence
> of an agreement on an overall objective, [a party] may prove such an agreement
> through "inferences from the conduct of the alleged participants or from
> circumstantial evidence of a scheme," amounting to evidence that each defendant
> necessarily must have known that the others were also conspiring to participate in
> the same enterprise through a pattern of racketeering.

*Browne*, 505 F.3d at 1263-64 (citations omitted). To support a RICO conspiracy claim, Plaintiffs

must allege "an illegal agreement to violate a substantive provision of the RICO statute." *Jackson*,

372 F.3d at 1269. "To be guilty of conspiracy . . . parties must have agreed to commit an act that

is itself illegal." *Id.* (quoting *United States v. Vaghela*, 169 F.3d 729, 732 (11th Cir. 1999)). "In

addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy." *United States v. Gonzalez*, 921 F.2d 1530, 1546 (11th Cir. 1991).

As with the substantive RICO claims, the existence of a genuine issues of material facts as to the enterprise element applies with equal force to Plaintiffs' RICO conspiracy claims. Because "a RICO conspiracy charge requires proof of an enterprise," the Court concludes that Plaintiffs' Motion for Summary Judgment on these claims must also be denied. *Id.* As discussed at length above, the record in the instant case presents genuine questions of fact as to whether Defendants were transacting with Abreu for their own independent, economic gain pursuant to a legitimate business relationship, rather than associating for the alleged enterprise's common purpose. To the extent that these issues require credibility determinations or the weighing of evidence, they must be resolved by a jury. *See Lewis*, 934 F.3d at 1179.

### C. Defendants' Motion for Summary Judgment

Defendants move for summary judgment on Plaintiffs' RICO claims and their unjust enrichment claim. Similar to their arguments in opposition to Plaintiffs' Motion for Summary Judgment, Defendants argue that no genuine issues of fact exist because Plaintiffs cannot prove the enterprise and continuity elements of their RICO claims under Counts I through IV. Defendants contend that "Plaintiffs' allegations and evidence make clear that the claims are based on a single scheme with a discrete goal and a limited number of victims and no threat of continuing illegal activity. The RICO statutes were not meant to reach such one-time, everyday theft schemes." ECF No. [261] at 1-2 (emphasis omitted). Defendants also argue that Plaintiffs' unjust enrichment claim fails as a matter of law because a claim for unjust enrichment cannot be predicated on alleged wrong acts to support the "unjust" factor.

In response, Plaintiffs argue that, consistent with the arguments in their Motion for Summary Judgment, the RICO claims are proven by undisputed material facts. Likewise, Plaintiffs allege that Defendants have failed to submit sufficient evidence of undisputed facts to warrant summary judgment in their favor. Plaintiffs further argue that Defendants' unjust enrichment arguments are unsupported by any facts in the record, are legally incorrect, and are an improper attempt to renew their motion to dismiss arguments that were previously denied. Plaintiffs also assert that the arguments regarding the unjust enrichment claim must fail because this claim is pled in the alternative, regardless of issues of fault.

In reply, Defendants argue that the allegations and evidence clearly establish one scheme with one goal and two victims, which was allegedly carried out by a handful of individuals acting for their own economic gain, rather than for the benefit of a RICO enterprise. Defendants also state that the law precluding unjust enrichment claims based on wrongful acts is clear — namely, the benefit conferred by Plaintiffs cannot be based on Defendants' alleged wrongful acts. Additionally, Defendants contend that Plaintiffs' unjust enrichment claim relies on the same factual predicates as the legal causes of action asserted and, therefore, it is not a true alternative theory of relief. As such, Defendants contend that they are entitled to summary judgment on all counts.

## 1. RICO Claims

The first argument presented in Defendants' Motion for Summary Judgment is identical to the arguments raised in their Response to Plaintiffs' Motion for Summary Judgment — namely, that Plaintiffs have failed to produce evidence of the existence of a RICO enterprise because they have not adduced any evidence establishing that Defendants associated with the participants of the theft ring for any purpose other than to commit the alleged singular goal of stealing Plaintiffs' scrap metal. The Court's analysis on Plaintiffs' Motion for Summary Judgment addressed and

rejected Defendants' arguments regarding the holding in *Turkette*. Further, the statements of fact in Defendants' SOF are premised on their erroneous arguments that a RICO claim requires proof of more than just a single scheme with a discrete goal and a limited number of victims and no threat of continuing illegal activity. However, because the Court has already rejected Defendants' argument that *Turkette* requires a party to prove an entity distinct from the pattern of activity in which it engages, these facts do not establish the absence of a triable issue of fact as to the enterprise element of Plaintiffs' RICO claims.

> When the *nonmoving* party has the burden of proof at trial, the moving party is not required to "support its motion with affidavits or other similar material *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, in order to discharge this "initial responsibility." Instead, the moving party simply may "'show[]'—that is, point[] out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 324.[n.19] Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. *Id.* at 331 (Brennan, J., dissenting). If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial. Fed. R. Civ. P. 56(e); *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," *Celotex*, 477 U.S. at 323, the moving party is entitled to summary judgment.
>
> > [n.19] . . . In [the Eleventh Circuit], "[e]ven after *Celotex*, it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991); *see also Celotex*, 477 U.S. at 328 (White, J., concurring) ("it is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case") . . . . Instead, the moving party must point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial. *Id.* at 325 ("a party seeking summary judgment always bears the initial responsibility . . . of *identifying those portions* of the materials on file which demonstrate the absence of a genuine issue of material fact" (emphasis added)).

*United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (footnotes omitted) ("*Four Parcels*"). Consistent with the

Court's discussion above, the instant case presents genuine issues of material fact with regard to the existence of a RICO enterprise. Therefore, Defendants' Motion for Summary Judgment on this issue is denied.

Defendants' next argument regarding the continuity element fares no better. Specifically, Defendants argue that Plaintiffs cannot establish continuity in this case because the alleged theft ring was a single scheme with a discrete goal and a limited number of victims and no threat of continuing illegal activity. Thus, Defendants move for summary judgment on Plaintiffs' RICO claims based on their inability to prove continuity. Because Defendants only challenge the continuity component of RICO's "pattern of racketeering activity," the Court need not address the other components under this element.

"An act of racketeering is commonly referred to as a 'predicate act.'" *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1292 (11th Cir. 2010). A pattern of racketeering activity "is shown when a racketeer commits at least two distinct but related predicate acts." *Id.*[14] However, a "'pattern of racketeering activity' requires proof of something beyond the two predicate acts themselves," which the Supreme Court has described as "'continuity plus relationship' among the predicates." *Gonzalez*, 921 F.2d at 1545 (citing *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)). "Predicate acts are related to each other if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995) (quoting *Sedima*, 473 U.S. at 496 n.14). "To establish a RICO pattern it must also be

---

[14] In a federal RICO action, a plaintiff "must identify and prove a pattern of racketeering activity, defined as two 'predicate acts' of racketeering activity within a 10 year period." *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1311-12 (11th Cir. 2000) (citing 18 U.S.C. § 1961(5)). In a Florida RICO action, however, a plaintiff must establish a pattern of at least two incidents of criminal activity, Fla. Stat. § 772.102(4), or of racketeering conduct, Fla. Stat. § 895.02(4), committed within a five-year period.

shown that the predicates themselves amount to, or that they otherwise constitute, a threat of *continuing* racketeering activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240 (1989).

"Whether the predicates [that are] proved establish a threat of continued racketeering activity depends on the specific facts of each case." *Id.* at 242. "There are two types of continuity that may establish a RICO claim: closed-ended continuity and open-ended continuity." *Daedalus Capital LLC v. Vinecombe*, 625 F. App'x 973, 976 (11th Cir. 2015) (citing *H.J. Inc.*, 492 U.S. at 241). "Closed-ended continuity refers to 'a closed period of repeated conduct.'" *Id.* (quoting *H.J. Inc.*, 492 U.S. at 241). "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. "This Circuit considers a two year [sic] period a 'substantial period of time.'" *Colonial Penn Ins. Co. v. Value Rent-A-Car Inc.*, 814 F. Supp. 1084, 1094 (S.D. Fla. 1992).

"Open-ended continuity refers to 'past conduct that by its nature projects into the future with a threat of repetition.'" *Daedalus Capital LLC*, 625 F. App'x at 976 (quoting *H.J. Inc.*, 492 U.S. at 241). For example, "[a] RICO pattern may surely be established if the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *H.J. Inc.*, 492 U.S. at 242. The threat of continuity may also be established in cases where "the predicate acts or offenses are part of an ongoing entity's regular way of doing business. Thus, the threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." *Id.* at 242-43. "The continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business (in the sense that it is not a business that exists for criminal purposes), or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *Id.* at 243.

Here, the Court concludes that the evidence in the record presents genuine issues of material fact as to continuity, which warrant the denial of Defendants' Motion for Summary Judgment. First, with regard to closed-ended continuity, the evidence establishes a series of 538 individual thefts of scrap metal from Plaintiffs' facility and were delivered to Metals USA. Fleites Dep. 131:20-132:5; *see generally* ECF No. [264-7]. These thefts spanned over a period of more than three years, from approximately April 2014 to January 2018, when Plaintiffs ultimately uncovered the scheme. Hr'g Tr. 19:16-19, 59:13-15, 83:21-84:20; Abreu Aff. ¶¶ 2-4; Gerding Dep. 43:10-17. Further, facts in the record support the assertion that Defendants committed the additional predicate acts of placing stolen materials into the stream of commerce, Hr'g Tr. 105:17-18; Lendian Aff. at 23, ¶ 21; committing wire fraud, *see* Abreu Aff. ¶¶ 5-6; Hr'g Tr. 93:14-18; ECF No. [264-8] at 4-5; and the conspiracy to commit these acts, Abreu Aff. ¶¶ 8-9; Hr'g Tr. 100:23-101:13, 148:9-149:5.

Likewise, with regard to open-ended continuity, the evidence demonstrates issues of material fact as to the threat of continuing racketeering activity. In particular, the record evidence establishes ongoing instances of criminal activity, and the threat of such continued activity, at the time Plaintiffs uncovered the theft ring. Gerding Dep. 49:2-62:6 (regarding Plaintiffs' discovery of the ongoing theft scheme through Torres's confession); Gerding Dep. 61:11-64:25 (regarding catching Abreu on video giving Torres an envelope of cash); Hr'g Tr. 56:3-10 (same); Hr'g Tr. 83:21-84:20 (regarding Abreu getting fired in February 2018 for his involvement in the theft ring at Plaintiffs' facility). Defendants do not provide any factual or evidentiary proof that the scheme's duration was discrete or time-limited in nature.[15] *See* Defs.' CSOF, ECF No. [272] at 1-18.

---

[15] *Cf. Daedalus Capital LLC*, 625 F. App'x at 976-77 (no threat of continued racketeering activity "*because [participants'] goal has been realized in the acquiring of the QU Project*, and there is no longer a working relationship between the two companies giving rise to the opportunity for Defendants' pattern of predicate acts to persist into the future." (emphasis added)); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d

Likewise, the facts in evidence demonstrate that many of Plaintiffs' customers were victimized by the theft ring because these customers were ultimately undercompensated for the amount of the material delivered due to the alteration of the scale weights. ECF No. [264-8] at 85-86 (Abreu: "That the victims are the . . ." Lendian: "The clients."); Hr'g Tr. 34:5-13 (scale manipulation resulted in underpaying customers); Gerding Dep. 54:15-57:5 (same); Abreu Aff. ¶¶ 17, 19 (regarding altering the weight on Plaintiffs' scales). The record also contains facts supporting the assertion that Defendants' were involved in the theft ring as a way of conducting their ongoing legitimate business. Fleites Dep. 113:5-114:23; Metals Dep. 27:5-29:19; Rodriguez Dep. 46:6-15; Lendian Aff. at 22, ¶¶ 6-9; ECF No. [264-8] at 12.

These facts, and the inferences derived therefrom, present legitimate questions of fact concerning the continuity element. *See Lewis*, 934 F.3d at 1179; *Bannum, Inc.*, 901 F.2d at 996. Moreover, that Defendants' numerous predicate acts were committed pursuant to a single related theft scheme does not change the Court's analysis, given the scheme's expansive, multi-level nature. *See Gonzalez*, 921 F.2d at 1545 (holding that repeated past and ongoing commissions of predicate acts established the pattern of racketeering activity, despite being "in close temporal proximity and related to a single importation scheme"). Thus, Defendants have failed to establish the absence of any genuine issues of material fact as to the continuity element here. As such, the Defendants' Motion for Summary Judgment must be denied as to this issue.

---

771, 782 (7th Cir. 1994) ("In assessing whether a threat of continued racketeering activity exists, we have made clear that schemes which have a clear and terminable goal have a natural ending point. Such schemes therefore cannot support a finding of any specific threat of continuity that would constitute open-ended continuity."). The mere fact that the theft ring in this case was ultimately uncovered is not sufficient to establish a lack of continuity. *See United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) ("An analysis of the threat of continuity cannot be made solely from hindsight. . . . The lack of a threat of continuity of racketeering activity cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment or guilty verdict."); *Lugo v. State*, 845 So. 2d 74, 100 n.50 (Fla. 2003) ("Lugo's arrest did not obviate the threat of continued criminal activity by the enterprise with which he was associated." (citing *State v. Lucas*, 600 So. 2d 1093 (Fla. 1992))).

## 2. Unjust Enrichment Claim

Defendants next argue that Plaintiffs' unjust enrichment claim fails as a matter of law because it is premised on Defendants' alleged wrongful conduct, rather than on a benefit conferred by Plaintiffs. Plaintiffs, on the other hand, argue that the issue of wrongful, as opposed to unjust, enrichment has been rejected by other federal courts in the Southern District of Florida. Likewise, Plaintiffs note that their unjust enrichment claim is pled in the alternative, regardless of the issue of fault, and that Defendants are improperly attempting to revisit their previously unsuccessful motion to dismiss arguments on this same issue.

"The elements of an unjust enrichment claim are a benefit conferred upon a defendant by the plaintiff, the defendant's appreciation of the benefit, and the defendant's acceptance and retention of the benefit under circumstances that make it inequitable for him to retain it without paying the value thereof." *Fla. Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1242 n.4 (Fla. 2004) (quoting *Ruck Bros. Brick, Inc. v. Kellogg & Kimsey, Inc.*, 668 So. 2d 205, 207 (Fla. 2d DCA 1995)); *see also City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1287 (11th Cir. 2015) (quoting *Gonzalez v. Eagle Ins. Co.*, 948 So. 2d 1, 3 (Fla. 3d DCA 2006)), *vacated on other grounds*, 137 S. Ct. 1296 (2017).

As an initial matter, the Court notes that the allegation in Defendants' SOF relating to their unjust enrichment arguments cites only to the Amended Complaint. This allegation states, in full:

> Plaintiffs' unjust enrichment claim is based upon Defendants alleged wrongful conduct, not a benefit conferred by Plaintiffs. Am. Compl., ¶ 110 ("***Through the fraudulent scheme***, Lendian, Metals USA, and Universal (collectively, the 'Lendian Defendants') ***have been unjustly enriched*** at the expense of Plaintiffs.") (emphasis added); *id.* at 111 ("Plaintiffs conferred a benefit on the Lendian Defendants, when the Lendian ***Defendants acquired*** the Plaintiffs' stolen scrap metal at well below market rates.") (emphasis added).

ECF No. [262] ¶ 6.

As explained above, a court should "grant summary judgment if the movant shows that there is no genuine dispute as to any material *fact* and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). A party's initial burden in moving for summary judgment is to "inform [] the . . . court of the basis for its motion and . . . identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp.*, 477 U.S. at 323).

Further, to be entitled to summary judgment, Defendants "must point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial." *Celotex Corp.*, 477 U.S. at 325; *see id.* ("a party seeking summary judgment always bears the initial responsibility . . . of identifying those portions of the materials on file which demonstrate the absence of a genuine issue of material fact"); *Four Parcels*, 941 F.2d at 1438 n.19 ("In [the Eleventh Circuit], '[e]ven after *Celotex*, it is never enough simply to state that the non-moving party cannot meet its burden at trial.'" (quoting *Clark*, 929 F.2d 604)). In order to satisfy their burden here, Defendants must provide citations to evidence in the record demonstrating that Plaintiffs' cannot meet their burden of proof at trial due to the absence of any genuine issue of fact.

"[A] sworn complaint constitutes summary-judgment evidence, just as if the same information had been set out in a declaration." *Sanchez v. Sanchez*, No. 5:10CV288-RH/EMT, 2015 WL 5016842, at *1 (N.D. Fla. Aug. 24, 2015) (citing *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)).[16]

---

[16] *See also Blum v. Morgan Guar. Tr. Co. of N.Y.*, 709 F.2d 1463, 1466 (11th Cir. 1983) ("A motion for summary judgment may be made solely on the basis of the complaint, in which case the motion is to be treated as the functional equivalent of a motion to dismiss for failure to state a claim under Fed. R. Civ. P.

The single statement included in Defendants' SOF with regard to unjust enrichment, however, fails to set forth any evidence establishing the absence of a genuine issue of fact that would entitle them to summary judgment. Indeed, Defendants' SOF on this issue, and the corresponding allegations from Plaintiffs' Amended Complaint that are cited, do not identify any facts at all, much less facts indicating that Plaintiffs cannot meet their burden of proof at trial on their unjust enrichment claim.

Likewise, Judge Zloch previously addressed — and rejected — a nearly identical argument in Defendants' motion to dismiss that a claim of unjust enrichment may not be predicated on a wrong committed by a defendant.

> A number of courts hold that a claim of unjust enrichment may not be predicated on a wrong committed by a defendant. In *Guyana Tel. & Tel. Co. Ltd. v. Melbourne Inter. Communications, Ltd.*, the Eleventh Circuit stated in a footnote: "As soon as [a] claimant relies on a wrong [to supply the unjust factor], the right on which he relies arises from that wrong, not from unjust enrichment." 329 F.3d 1241, 1245 n.3 (11th Cir. 2007) (alterations in original) (quoting Peter Birks, *Unjust Enrichment and Wrongful Enrichment*, 79 Tex. L. Rev. 1767, 1783 (2001). *See also Flint v. ABB, Inc.*, 337 F.3d 1326, 1330 n.2 (11th Cir. 2003) (citing to the same article in a similar footnote). Following the dicta in *Guyana*, the district court in *State of Fla., Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp.*, dismissed the plaintiffs' unjust enrichment claim where the unjust enrichment was the result of an alleged wrong. 420 F. Supp. 2d 1288 (S.D. Fla. 2005) (as in the above styled cause, the unjust enrichment claim accompanied RICO claims). In a line of cases following *Tenet*, federal district courts in Florida have dismissed unjust enrichment claims where the mechanism of enrichment was an alleged wrong. *See e.g. Taxinet Corp. v. Leon*, 16-24266-CIV, 2018 WL 3405243, at *7 (S.D. Fla. July 12, 2018); *Freestyle Slides, Inc. v. Super Sweet Air, Inc.*, No. 6:17-cv-169-Orl-41GJK, 2018 WL 3819073, at *4 (M.D. Fla. July 9, 2018); *Swipe For Life, LLC v. XM Labs, LLC*, No. 10-22337-CIV, 2011 WL 13220766, at *5-6 (S.D. Fla. Nov. 8, 2011); *Group Assets, LLC v. Fortress Inv. Group*, No. 8:09-CV-1530-T-33EAJ, 2010 WL 2951508, at *4 (M.D. Fla. June 22, 2010); *Tilton v. Playboy Entm't Group, Inc.*, 88:05-cv-692-T-30TGW, 2007 WL 80858, at *3 (M.D. Fla. Jan. 8, 2007); *Union Pacific R.R. Co. v. Paragon Laboratories, Inc.*, No. 06-60873-CIV, 2006 WL 3709619, at *4 (S.D. Fla. Dec. 14, 2006).
>
> However, other courts reject this position, and maintain that Florida law makes no distinction between wrongful enrichment and unjust enrichment; these courts hold that a claim of unjust enrichment may be predicated on a wrong. *See e.g. State Farm Mutual Auto. Inc. Comp. v. Performance Orthopaedics &*

---

12(b)(6). In this posture, the court must construe the complaint liberally in favor of the plaintiff, taking the facts as alleged as true. The motion should be denied if a claim has been pleaded." (citation omitted)).

*Neurosurgery, LLC*, No. 1:17-CV-20028, 2018 WL 2186496, at *14 (S.D. Fla. Feb. 16, 2018); *Absolute Activist Value Master Fund Limited v. Devine*, 233 F. Supp. 3d 1297, 1329 (M.D. Fla. 2017); *State Farm Fire & Cas. Co. v. Silver Star Health and Rehab Inc.*, No. 6:10-cv-1103-Orl-31GJK, 2011 WL 6338496, at *6 (M.D. Fla. Dec. 19, 2011), *aff'd sub nom. State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579 (11th Cir. 2013) (the Eleventh Circuit did not address the question of whether or not an unjust enrichment claim may be predicated on a wrong).[17]

*AIM Recycling Fla., LLC v. Metals USA, Inc.*, No. 18-60292-CIV, 2019 WL 1991946, at *1-2 (S.D. Fla. Mar. 4, 2019). Ultimately, the Court declined to address this argument of Defendants' motion to dismiss, finding the instant case to be distinguishable, because the unjust enrichment claim was adequately pled in the alternative, irrespective of fault. *Id.* at *2 (citing *United States v. Liberty Ambulance Serv., Inc.*, No. 3:11-cv-587-J-32MCR, 2016 WL 81355, at *4 (M.D. Fla. Jan. 7, 2016) (allowing unjust enrichment claim to be pled in the alternative to plaintiff's legal claims in anticipation of defendants claiming that no wrong occurred); *Senior Management, Inc. v. United Health Adm'rs, Inc.*, No. 8:12-cv-2321-T-30MAP, 2013 WL 3285419, at *4 (M.D. Fla. June 27, 2013) (dismissing plaintiff's unjust enrichment claim because it was predicated on an alleged wrong, but granting leave to amend complaint to plead unjust enrichment in the alternative)).

Given the failure to demonstrate the absence of any triable issue of fact, the Court concludes that Defendants' unjust enrichment arguments constitute an improper attempt to relitigate their previously unsuccessful motion to dismiss arguments. Further, the Court agrees with Judge Zloch's reasoning above. Plaintiffs have pled their unjust enrichment claim here in the alternative and "[i]rrespective of issues of fault," ECF No. [24] ¶ 113, and the Court need not address the issue of whether an unjust enrichment claim may be predicated on an alleged wrong.

---

[17] *But see Rajput v. City Trading, LLC*, 476 F. App'x 177, 180 (11th Cir. 2012) (reversing dismissal of plaintiff's complaint alleging facts connecting defendants to the alleged fraud sufficient "to support a claim of unjust enrichment based on Defendants' control of funds illicitly gained through the fraud").

Therefore, the Court concludes that Defendants are not entitled to summary judgment on Plaintiffs' unjust enrichment claim.

## V. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' Renewed Motion for Partial Summary Judgment as to Liability, **ECF No. [263]**, is **DENIED**.

2. Defendants' Motion for Summary Judgment, **ECF No. [261]**, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on January 13, 2020.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record